THOMAS L. PALMER *v*. STATE OF INDIANA.

[No. 472A200. Filed November 8, 1972.]

650

R. *Kent Witte,* of Columbus, for appellant.

*Theodore L. Sendak,* Attorney General, *Mark Peden,* Deputy Attorney General.

LOWDERMILK, J.—This case involved a criminal charge of rape brought by the State of Indiana against the defendant-appellant, of which he was found guilty by a jury and for which he was sentenced to the Indiana Youth Center.

On October 2, 1971, Katherine Hodge, a white female, 21 years of age, resided in one of several occupied upstairs apartments in the City of Columbus, Indiana, at 715 Sycamore Street.

Miss Hodge was a telephone operator in Columbus, and worked on the second shift, usually getting off work about 11 o'clock at night.

On the night in question, at about 12:30 A.M., Kathy Hodge was home from work on a hot night, watching the late show on television and clad in a T-shirt and panties. There was a rap at the door and she asked who was there and got no answer. The same thing was repeated a second time, at which time she put on a housecoat and without ascertaining who was at the door, opened the back door of her apartment onto an outside stairway.

The defendant-appellant was there and asked of the whereabouts of one Beverly Baugher, and was not invited into the apartment, but came in. (Miss Hodge was a good friend of Beverly Baugher, who was dating the defendant-appellant and

had been with him at the apartment of Miss Hodge on two or three occasions.)

The defendant-appellant sat on one end of the couch and Kathy Hodge sat on the other, and they talked for some time. He discussed some paintings on the wall and wanted to see the rest of the apartment, including the bedroom, to see if there were any similar paintings in there, and Miss Hodge followed him in.

Kathy Hodge was standing a couple of feet from defendant-appellant in the bedroom and after he had looked it over she turned to leave, but states that when she did that Palmer hit her in the back of the neck, shoved her down on the bed and pinned her arm behind her. She related that the blow did not knock her onto the bed, but he pushed her there. While on the bed Palmer removed a "muscle shirt" from his pocket, wrapped it around her mouth and started to tie it. Kathy was on her stomach on the bed and the defendant-appellant Palmer was on her back, pressing down on her back and his shoulders were over hers, according to her statement. Later he loosened the shirt. She related then that she asked Palmer to get off her back and leave her alone and he said "shut up, shut up." Here evidence is that he yanked her up off the bed, dragged her into the bathroom with her arm behind her back, and asked her to show him where the towels were. He took six or seven towels, brought her back to the bedroom, shoved her down on the bed, and started to tie her up with the towels. At that time she relates that she told him not to tie her up, and 'she wouldn't fight him. He then abandoned the use of the towels but continued to hold one of her arms and made her take off all of her clothes. Defendant-appellant Palmer then asked her to sit on the edge of the bed while he stood in front of her and took off all of his clothes. This was followed by Palmer pushing her back onto the bed, at which time he suggested the act of fellatio. She pretended she was going to do this, scooted toward the edge of the bed, noticed he had an erection, grabbed his testicles, dug her fingernails as hard as she could

and jumped off the bed. Palmer, she further stated, groaned and pleaded for her to release her grip, but Kathy just kept digging her fingernails in as hard as she could, and jumped off the bed.

In the meantime she reached over the top of the bookcase, got a marble book end and hit him on the head with it, but when she struck him across the forehead she loosened her grip on his testicles. She then claimed he grabbed her arm, slapped her, knocked her down on the bed, and attempted to choke her and she started screaming.

Evidence of the screaming was corroborated by one Glenda Frazee, who lived in Apartment 2 of the same apartment house and she said that she did hear a woman scream, but thought it was kids living next door who had parties all the time. She thought the screaming came from 705 Sycamore Street, too. This scream was at approximately 3:00 or 3:30 A.M.

Wesley Sigler, also a resident of the apartment house, testified that in the early morning hours of October 2, 1971, he heard a woman scream, one time, and that it awakened him from his sleep. He further testified he did not know where the "hollering" came from, as there were no distinct words. He further testified it was very hot that night and he was sleeping with the four windows open in his apartment.

One Donald C. Gates, who resided at 738 Seventh Street at the northwest corner of Seventh and Sycamore in Columbus, which was across the street from 715 Sycamore Street, testified that he was awakened on October 2, 1971, when he heard a lot of screaming and the screaming indicated words saying "please, please, please don't, please." He determined that the screams came from across the street and upstairs. His bedroom windows were open at the time. He estimated the screams lasted no more than a moment or two.

Gates further testified he had seen the defendant-appellant before, on several occasions, going in and out of the house at

705 Sycamore Street, and he saw him come out of that address at 10:30 A.M. on October 2, 1971.

The prosecuting witness testified that, after striking the defendant-appellant on the forehead she screamed as loud as she could; that Palmer was right on top of her in the bed and was choking her.

This evidence is corroborated by color photos of the sides, front and back of Miss Hodge's neck, showing deep discolored marks on the throat and face. The doctor testified they were gone in a few days.

Miss Hodge further testified that Palmer continued to slap her several more times and made her put a couple of band aids on his forehead. After the band aids were obtained in the bathroom she testified that Palmer dragged her back to the bedroom and had intercourse with her.

Intercourse occurred with Palmer on top and Kathy on her back and under him. Kathy related that she knew intercourse had occurred and penetration had been accomplished. She further stated that the intercourse lasted about one-half hour and she would not have had intercourse with Palmer if it had not been for threats and physical violence.

Miss Hodge further testified that after the initial act of intercourse the defendant-appellant took her back to the bathroom, holding her arm, while he urinated, and after which she related that he sat on the edge of the tub and she sat on the commode and he engaged her in a long conversation about school, I.Q., and his high intellgence. This lasted for about twenty minutes. An exhibit which is a photograph of the bathroom shows that the commode is in the end of the room and the bath tub is between it and the door.

He then asked her for whiskey and she had a part of a half pint from which he took a couple of large swallows.

They then went back to the bedroom and they had another act of intercourse. Palmer attempted anal penetration, but she started to scream. He removed his penis and then inserted

it in her vagina. This act of intercourse lasted approximately one-half hour.

The prosecuting witness was uncertain whether he had a climax in either act of intercourse.

After this, they returned again to the bathroom and she had to urinate and again they sat as they had before and talked a few more minutes. She was not at all restrained by him, nor did he strike her at that time. Defendant-appellant told Miss Hodge that he had promised himself to have three acts of sexual intercourse with her, but he didn't think he could do it the third time. (He claimed to have had an act of sexual intercourse with some woman across the street before he came over.)

At this time the defendant-appellant got dressed, grabbed up what was left of the one-half pint of whiskey, and left, and the prosecuting witness pretended that she was going to go back to bed, but as soon as she determined he was gone she slipped on some clothes and drove to her aunt, Betty Beaman, at Taylorsville, Indiana, arriving there about 5:30 A.M. She told what had happened and they drove to the Bartholomew County Hospital, arriving a little after 6 A.M. The police were there, and a doctor. She was examined by a Dr. Daugherty at about 7 o'clock A.M. and questioned by the police. Dr. Daugherty testified he examined Miss Hodge, found the injuries to her neck and upper extremities were of no medical significance and needed no treatment. He then performed a routine pelvic examination, and found vaginal secretions but felt a laboratory evaluation was necessary to determine the absence or presence of sperm.

One Robert Bush, M.D., testified he was a pathologist at the Bartholomew County Hospital and at about 9 A.M. on October 2, 1971, he examined two glass slides and found numerous spermatozoa on the slides.

Defendant-appellant Thomas L. Palmer took the stand in his own behalf and testified that he did go to the home of the prosecuting witness and that he did visit with her and she

came over and sat down next to him on the couch, where they "petted" for about five or ten minutes, then they went to the bedroom where they fondled one another and sat on the bed without any disapproval on her part. He denies holding her arms or using any force to stay on the bed and said that this "petting" caused him to become sexually excited. They both got up, took off their clothes, after which they continued to "pet" and returned to the bed and he started to have sexual intercourse with her.

He further testified he placed his penis in her vagina and she did nothing to fight him, nor did she tell him to get out; the intercourse lasted for approximately fifteen minutes, during which time she did nothing to try to push him off. He explained he reached a climax and right before this Kathy told him the least he could do was pull it out prior to orgasm; she didn't want to have any babies, especially Negroes. He further testified that after he reached his climax Kathy started to scream and grabbed his testicles and he raised from the bed in pain. She picked up something which was heavy and hit him in the head with it and he felt her fingernails in his testicles and the pain was great. He said he then grabbed her throat, not to harm her, but simply to make her let go of his testicles. He also testified that he screamed out in pain.

Defendant-appellant's evidence on the matter of the prosecuting witness's actions at the time he says he reached his climax into her vagina was such that it would raise the question in the mind of the ordinary man or woman juror as to whether the prosecuting witness was horrified at the thought of mothering a Negro child or was so extremely exhilarated at this point of intercourse that she became physically active in what she claimed was an attempt to rid herself of the defendant-appellant and avoid the possibility of becoming pregnant.

Defendant-appellant further testified that after this they went to the bathroom where she assisted in taking care of his wounds and putting a band aid on his head and they

were in the bathroom only one time that evening and that was after they had had intercourse. He further testified they had intercourse only one time that evening and it was completely voluntary on the part of Miss Hodge; that she could have left on several occasions, both before and after they had had intercourse.

On cross-examination defendant-appellant testified that he choked Miss Hodge only to make her release his testicles because of the severe pain. He further testified that Miss Hodge became upset, not because he took too long in reaching a climax, but because he discharged in her.

The court passed the statutory sentence on the defendant-appellant, after which defendant-appellant timely filed his motion to correct errors.

Defendant-appellant's first statement of the argument is that specifications numbered 9, 12, 13, and 14 of the motion to correct errors are not discussed. We shall, therefore, pursuant to Rule AP. 8.3 (A) (7) consider specifications 9, 12, 13, and 14 waived.

Defendant-appellant has grouped specifications numbered 1, 3, 4, and 5, which we shall discuss together.

The first specification is that defendant-appellant did not get a fair trial because of misconduct of the State and uncorrected error of law occurring at the trial by which defendant was prejudiced because the Prosecuting Attorney, in his closing argument, improperly compared the defendant to a convicted murderer, Richard Speck, with the sole purpose in mind of inflaming the jury toward conviction and which alleged error was not cured by the trial judge sustaining defendant's objection thereto or statements made by defendant's counsel.

Specification No. 3 is another claimed error for denial of a fair trial and misconduct by the State and uncorrected error of law occurring at the trial, which prejudiced the defendant in that in cross-examination of a character witness

for the defense, Joe E. Ebert, the Prosecuting Attorney, improperly antagonized the witness by slurring the defendant; by the Prosecuting Attorney improperly referring to conduct of the spectators and alleged remarks made by them to various people in the hall of the court house, which remarks were made before the jury and resulted in causing the jury to become confused and inflamed against the defendant and defendant's motion for a mistrial should have been granted by the court. He further claims error on the part of the Prosecuting Attorney for saying that the defendant "knew the ropes."

Specification No. 4 is a denial of a fair trial and misconduct of the State and uncorrected error of law occurring at the trial by which defendant was prejudiced in that the Prosecuting Attorney became argumentative in his cross-examination of the defendant about why the defendant didn't strike the prosecuting witness and his comments were for the sole purpose of ridiculing the defendant and inflaming the jury. That the conduct of the Prosecuting Attorney in so questioning the defendant was highly prejudicial, immaterial and irrelevant and constituted a serious breach of the Prosecuting Attorney's duty to insure the defendant a fair and impartial trial; that the highly prejudicial nature of his question was not cured or removed from the jury's minds, either by the court's ruling or the defendant's objections.

Specification No. 5 is a denial of a fair trial and misconduct by the State and uncorrected error of law occurring at the trial by which defendant was prejudiced in that the Prosecuting Attorney by the contents of his questions clearly and directly intimated that the defendant was lying in order to cover the testimony of the State's witness, Gates. That such evidence was highly prejudicial to the defendant, whether true or not true, and it breached the Prosecuting Attorney's duty to insure the defendant a fair and impartial trial. That the highly prejudicial nature of the question was not cured or removed from the jury's mind because the court overruled

defense's objection in referring to the prosecution witness, Mr. Gates.

(A) Defendant-appellant sets out that the Prosecuting Attorney was guilty of misconduct in comments about the defense counsel.

This particular charge was brought about by defense counsel asking Sergeant Wolfe if he saw anyone else at Miss Hodge's apartment that evening before Tom Palmer was allegedly there. His answer was "no" and the next question was:

"Isn't it a fact that you told Val Jones that two other black guys had been there that night?"

The Prosecuting Attorney objected on behalf of the State to the defense interjecting things unless he intended to prove them, only for the purpose of suggesting something to the jury that, in fact, did not exist.

Defense counsel then moved for a mistrial on the Prosecuting Attorney's comments.

The trial judge admonished both lawyers to calm down, overruled the objection at that time, and ordered counsel to confine the cross-examination to what was gone into on direct examination.

In our opinion, there was no misconduct on the part of the Prosecuting Attorney, but if there was any misconduct it was on the part of the defense counsel for asking questions which the evidence never followed up and apparently there were no two other persons at Miss Hodge's apartment that day.

(B) Defendant-appellant next charges error in failure of the trial court to rule.

The questions and answers are as follows:

"Q. And who is portrayed in those photographs?
A. Miss Kathy Hodge.

Q. Do these photographs fairly, correctly and accurately portray the condition of her face and neck as they appear in these photographs and as they appeared on October 2, 1971? With regard to markings?

A. Yes, obviously they do. My only remark is that as I recall —"

Objection—Mr. Witte:

"Now, Your Honor, we're going to ask that the doctor answer the Prosecutor's questions."

"A. Yes, they do."

There is no failure of the trial court to rule here, as the witness completed the answer to the question after the defendant asked the court to require the doctor to answer the Prosecuting Attorney's question. There being nothing before the court there was nothing for the court to rule on.

In the case of *Lincoln* v. *State* (1921), 191 Ind. 426, 430, 133 N. E. 351, our Supreme Court said:

"But the examination of witnesses and arguments of counsel are subject to the control of the court, in the exercise of a sound discretion, and not every improper act or statement permitted by the court will require that the submission be set aside and the jury discharged, or that the judgment be reversed on appeal. . . ."

In *Croatian Bros. Pkg. Co.* v. *Rice* (1925), 88 Ind. App. 126, 128, 147 N. E. 288, counsel insisted the motion for new trial should have been sustained because of alleged misconduct of the counsel for the appellee, while examining jurors as to their qualification to serve on said jury.

The court said:

". . . The specification in the motion for a new trial was supported by the affidavit of counsel for appellant, attached to said motion, wherein the alleged misconduct is set forth. This record, as it comes to us, presents no question on this matter. This court can only review alleged errors of law. This means that the trial court must have made a *ruling* involving a matter of law, and that the party complaining in this court must have taken an exception thereto. In the

absence of such ruling, no question of law can be involved, and therefore, also, no exception. Such exception can only be taken by the party or parties, to whom the ruling is adverse. Counsel in this case point to no adverse ruling of the court, and therefore, to no error. . . ."

See, also, *Headlee* v. *State* (1929), 201 Ind. 545, 562, on petition for rehearing.

(C) Failure to allow defense counsel proper cross-examination.

The witness was asked if she approved of the mixing of the races, to which she answered "Absolutely not."

She was then asked the following question:

"Do you feel that a black person is more apt to commit a crime than a white person?"

The Prosecuting Attorney said "I am going to object to this" and the judge immediately sustained the objection.

Clearly, the court's ruling sustaining the objection was correct. The question called for a conclusion of the witness and had nothing to do with the trial at issue. And, further, the ruling was solely within the discretion of the trial court.

(D) Failure to rule by the trial court.

Under this specification the Prosecuting Attorney asked Miss Hodge certain questions about the defendant-appellant going to the bathroom and how long he remained, and to the last question she answered "About fifteen minutes." The next question and answer are as follows:

"Q. A Fairly long period of time?
A. Yes, seemed to me."

Defendant-appellant's attorney objected as follows:
"Now I'm going to object, Your Honor. The Prosecutor can ask questions, but I object to the editorial comment, and we ask that he refrain from doing so."

Judge:
"Go ahead."

In our opinion, and from experience with trials of lawsuits, it appears to us that when the judge said "Go ahead" he felt that no harm had been done and that the trial should move forward and that the same amounted to an overruling of the objection.

We do not believe the same to be error, and if it were error then it was harmless error.

(E) Defendant-appellant's counsel next complains of the Prosecuting Attorney's using leading questions.

In the interest of brevity we will not state the questions, but admit that the questions were somewhat leading.

Objection by Mr. Witte was:

"Now, Your Honor, again, I'm going to object. He can ask the young lady questions."

Judge:

"State your objection, Mr. Witte. What is your objection?"

Objection—Mr. Witte:

"I object to the Prosecutor leading the witness, Your Honor."

Judge:

"Objection sustained."

The defendant-appellant got the ruling he wanted; the ruling, in our opinion, was correct, as the questions were leading and the objection was sustained.

(F) The defendant-appellant next complains the Prosecuting Attorney tried to elicit testimony concerning physical force when it had been testified to.

Questions, answers, objections and rulings were as follows:

Q. "Tell the jury, if you would, why you permitted this man to engage in these acts of intercourse that you have described?"

Objection—Mr. Witte:

"I'm going to object to this question, Your Honor. I don't think it's proper."

Judge:
"Mental condition does have a part in a case such as this, Mr. Witte. Objection overruled."

Q. "Tell the jury why."

A. "Because he threatened to kill me if I didn't let him."

Q. "All right, and did he use physical force on you throughout this period of four hours?"

A. "Yes."

Q. "And what did that consist of?"

A. "Striking me —"

Objection—Mr. Witte:
"I'm going to again object, Your Honor, as she has already described the physical force."

Judge:
"Objection sustained. She's already described it."

The objection here was proper. This evidence had been gone into once and the court sustained the objection and kept the witness from answering.

(G) Failure to rule by the trial court:

The following questions were made, to which the following answers were given, objections made and the judge's rulings were had:

Q. "Was the bed right there for him to shove you on when it was down in the south of the room?"

A. "Yes, it was, the bed, as you have seen, I suppose you went over there yesterday, didn't you?"

Q. "I'll ask the questions if you don't mind."

A. "The bed is as long from one—, no matter which side of the room that it's in, when it's on that side, it's just as long. The bed didn't shrink."

Q. "Oh, thank you. I didn't think it had."

Objection—Mr. Wilson (Prosecuting Attorney):
"I would object to Mr. Witte's comment."

Judge:
"Objection sustained, let's keep it —"

Objection—Mr. Witte:
"Well, I object, Your Honor to the witness not being responsive and smarting off."

Judge:
"No, well let's not either one 'smart.' Don't argue with the witness."

Our review of the questions and answers leads us to believe that the answers were responsive to the questions and, further, the witness was the prosecuting witness and was undergoing a serious and embarrassing cross-examination by defendant-appellant's counsel and she may have or may not have intended to be "smart" when she said "The bed didn't shrink."

In our opinion, the judge correctly ruled when he said he did not want either one to be "smart" and admonished counsel not to argue with the witness.

(H) Failure of the Court to allow defense counsel proper cross-examination.

The following question was asked, to which the following objection was made and ruling thereon:

Q. "And generally you feel that anybody that would date a white girl would have to be kind of inferior and disapprove of them?"

Objection—Mr. Wilson:
"I will object to this."

Judge:
"Objection sustained, we've been over that."

Mr. Witte:
"Your Honor, I would feel that this is extremely important."

Judge:
"Mr. Witte, you've been over it once."

In our opinion, the ruling is absolutely correct. The matter had been gone into previously and, in our opinion, was being asked by defense counsel solely for the purpose of creating racial prejudice which the trial court did not and this court will not tolerate.

(I) Failure to rule by the trial Court.

The prosecuting witness was asked the following questions, to which she gave the following answers:

Q. "Did you give him this whiskey to take with him?"
A. "Yes."

Q. "You did?"
A. "Well I didn't try to stop him. I said, 'You can take it if you —' "

Objection—Mr. Witte:
 "Now, Your Honor, she answered the question when she said yes."

Judge:
 "Go ahead."

Q. "Did you give it to him, did he ask for it?"
A. "No."

Q. "He just took it. Well that's unimportant as far as that goes. That's all."

In our opinion, the interrogation here as to the defendant-appellant's taking the balance of the whiskey when he left is immaterial to the issues and the judge's failure to rule is not error and we assign for our reasons that same reasons assigned to specification (B), above.

(J) Improper cross-examination.

The question asked was:

Q. "Do you know that house's reputation in that neighborhood?"

Objection—Mr. Witte:
 "I'm going to object, Your Honor, there has been some dispute as to the reputation. We're going on what Mr. Gates said."

Judge:
 "He's asked if he knows the reputation. Objection overruled."

The ruling of the court was correct and proper, as the question merely called for a "yes" or "no" answer that could not, in anyway, prejudice either of the parties.

(K) Improper cross-examination.

The following questions, objections, rulings and answers were made:

Q. "And so you then rekindled this friendship with Mr. Palmer?"

Objection—Mr. Witte:
"Now, Your Honor, I'm going to object to these little cute innuendos, rekindles, and I think it's obvious the innuendo he's trying to put on this questioning."

Mr. Wilson:
"Well, maybe he'd better take me aside and tell me what I'm trying to do."

Judge:
"Objection overruled. I don't see that, Mr. Witte."

Q. "That's when you rekindled this friendship with Mr. Palmer?"

A. "Yes, sir."

In our opinion, the court's ruling on the State's question if the prosecuting witness rekindled her friendship with Mr. Palmer was proper, as it bore probative evidence as to any hatred or ill-will growing out of the alleged rape and would go to her credibility as a witness.

(L) Improper cross-examination:

The following questions, answers, objections and rulings of the judge were had:

Q. "And his reputation is good, as far as you know, amongst who?"

A. "Just people."

Q. "This group of friends that hangs around 705 Sycamore."

Objection—Mr. Witte:

The right to ask leading questions on cross examination is so well established that it needs no citation of authority here. The ruling of the trial court was correct.

(M) Derogatory comment by Prosecuting Attorney about the defendant:

The following questions, answers, objections and rulings of the judge were made:

Q. "He has no difficulty whatsoever going with women, is that correct?"
A. "No."
Q. "And considers himself pretty much of a ladies' man?"
A. "Oh, I don't know about that, but he never has any trouble whatsoever—"
Q. "Talk to you about that sort of thing, does he?"
A. "No."
Q. "Who he's been going out with?"
A. "Oh, he talks to me, he tells me, you know, who they are, you know, what they do, you know, just general stuff."
Q. "A man that knows the ropes?"

Objection—Mr. Witte:
"Now, Your Honor, I'm going to object. This is definitely an inflection and a slur on my client."

Judge:
"Well, Mr. Witte, you brought up the fact, or went into this."

Mr. Witte:
" 'Knows the ropes' is not—"

Judge:
"Objection overruled."

Defendant-appellant's counsel having gone into the matter of his client's being popular with the ladies, et cetera, on direct examination now precludes his objecting to cross examination on the subject.

The court was correct. When one side opens the gate it stands wide open and the other side can drive right through. The defendant having opened the gate here cannot now be heard to object.

(N) Prejudicial atmosphere created toward the defendant.

Questions were asked about the defendant-appellant knowing his way around and the answer was that it depended on what you mean by his knowing his way around.

The next question was "With women?" and the answer was "Do you want to specify that more?"

At that point, noise erupted in the courtroom, fingers snapped and there was a commotion in the spectator's section of the courtroom. Mr. Wilson, the Prosecuting Attorney, addressed the court and stated that he objected to the conduct of the spectators in the courtroom and remarks made to various people in the hall, such as the thing that had happened in the courtroom at that time.

Mr. Witte:
 "Now, Your Honor, if the Prosecutor—"

Judge:
 "Now, just a minute. The spectators, this is not a carnival. It's a very serious matter. There will be no snapping of fingers, no show of emotion, no nothing. If there is anything else, I'll clear the courtroom, and there's plenty of room over at the jail, and I've got no worries about doing it, no matter what. Just bear that in mind. I want everything peaceful and quiet."

Mr. Witte:
 "Your Honor, at this time I'm going to move for a mistrial. I feel that the atmosphere has become so hostile to my client that it is just not possible that he receive a fair trial at this time."

Judge:
 "Motion is overruled."

The court has wide discretion in determining whether a party litigant has been prejudiced by conduct of counsel or by an atmosphere created by spectators in the courtroom and it is solely within his province and his duty to determine if the party has been prejudiced, and, if so, a mistrial should be ordered and if not then the jury should be admonished as to its duties under the state of

facts, the counsel should be admonished to refrain from such tactics and this court will not thereafter interfere with the discretionary ruling of the trial court. 28 I. L. E., *Trial,* § 81, p. 79.

(O) Improper remarks by the Prosecutor objected to and no ruling by the court.

The following questions were asked, answers given, objections made and ruling by the court:

Q. "All right, and I'm asking you from that position, and your arms spread lifting yourself up, how did she reach that bookend?"
A. "She didn't."
Q. "I thought you said . . ."
A. "This is what I'm telling you, she picked me up, she lifted me up off of her."
Q. "Well, now Charles Atlas couldn't do that."
A. "Oh, Charles Atlas could too."

Objection—Mr. Witte:
"Now, Your Honor, wait a minute. I object to these comments. I think the Prosecutor knows what he means by lifting him up, obviously."

Mr. Wilson:
"Well, I know what I know by lifting, but I don't know what he knows, he means by lifting."

Mr. Witte:
"Not claims this girl lifted him physically up."

Judge:
"Ask another question."

A careful review of these questions and answers, objections and statements of counsel does not disclose to this court that any improper remarks were made by the Prosecuting Attorney. Apparently it seemed the same to the court, as he instructed the Prosecuting Attorney to ask another question.

(P) Prosecuting Attorney arguing with defendant.

In this series of questions and answers the Prosecuting Attorney interrogated defendant-appellant about why he did

not strike the prosecuting witness with his fists and his answer was that he was too busy screaming, as she was holding him.

He was then asked the question:

Q. "That would be more logical than choking somebody, be to strike at them, wouldn't it?"

To this, Mr. Witte objectioned and did not state his reason, but the court sustained the objection on the theory that the question was argumentative. In our opinion, this was a proper ruling by the court and there was no error.

(Q) Improper argument by the Prosecuting Attorney allowed by the trial court.

The Prosecuting Attorney asked the defendant-appellant the following questions, to which were given the following answers, and to which objection was made by defendant-appellant's counsel, and ruled on by the court:

Q. "And then you pointed up to Londa's apartment?"
A. "Yes."
Q. "What did you point up there for?"
A. "I don't know. We was jokin' about somethin'."
Q. "You remember pointing at Londa's apartment?"
A. "Oh, yeah, I remember jokin'."
Q. "Is this to explain Mr. Gates' statement that you pointed to Miss Hodge's apartment?"

Objection—Mr. Witte:
"Now, Your Honor, I'm going to object to the form of that question, and I don't think he is bound to explain Mr. Gates' testimony, nor speculate on if that's an answer to Mr. Gates' testimony."

Judge:
"Objection overruled. He's asked him specific questions."

In our opinion, there was no error and the court properly overruled the objection.

(R) Improper cross-examination by the Prosecuting Attorney of the defendant concerning the defense attorney's opening statement which the trial court allowed.

A series of questions were asked by the Prosecuting Attorney of the defendant-appellant about the prosecuting witness being upset because the defendant took too long in reaching a climax and the defendant's answer that it was that she became upset because he ejaculated in her, and she didn't want him to. He was asked if she was aware of that at the time and the defendant answered "Yes, she was."

The Prosecuting Attorney then said that as he recalled the opening statement in the case that it was because the defendant took too long and the defendant said that he did not say that in his opening statement. The Prosecuting Attorney then remarked that it was defendant's attorney who made the opening statement and he was asking him the reason.

Mr. Witte, attorney for defendant-appellant, objected to the State cross examining on the opening statement and made the remark that if he wanted to ask him what he said it would be fine.

The judge overruled the objection and to which Mr. Witte said:

"It's not of record, and we can't go back and play it."

Judge:

"Objection is overruled."

The question here before the court is narrowed down to what an opening statement is, what it is intended to do, and whether or not a defendant can be cross-examined on his attorney's opening statement of defendant's case.

Defendant-appellant cites only one Indiana case, namely, *Bolden* v. *State* (1927), 199 Ind. 160, 155 N. E. 824.

A study of the *Bolden* case discloses that the defendant was tried by a jury and found guilty of second degree murder. In *Bolden,* the court said:

> "In a criminal action, it is reversible error for a court, *over objection,* to permit a prosecuting attorney in his opening statement to attack the character of the accused by charging the commission of other crimes. [Citing cases.]

In *Sasse* v. *State, supra,* the district attorney, in opening the case to the jury, stated that the defendant committed a crime in Germany and fled from justice and after landing in this country committed another crime. It was held that this was such error as to render a new trial necessary, although the trial judge, in ruling that such statement could be made, suggested that the fact that the accused had committed one crime was no evidence that he committed the crime for which he was being tried, and afterward instructed the jury not to regard such statement and that it was not in the case. * * *

"The use of the objectionable language by the assistant prosecuting attorney in his opening statement constituted misconduct. The state does not attempt to justify same; but says that every reasonable presumption is in favor of the ruling of the trial court, and says that, as the instructions are not in the record, it will be presumed that the court admonished the jury to disregard the alleged prejudicial statements. . . ."

The court refused to so instruct the jury at the time the statements were made and our Supreme Court made the statement that it would not presume that the court permitted the defendant to lie under the accusations during the entire trial and then told the jury to disregard them.

Further, the court said, in *Bolden, supra:*

". . . In *Robb* v. *State* (1896), 144 Ind. 569, 43 N. E. 642, it was said such a presumption would exist; but, in that case, no request was made to withdraw the submission or to direct the jury to disregard the statements; and no such motion was overruled as in the instant case. If the appellee finds the transcript to be incomplete, he should procure it to be made perfect, if he can thereby show that the error complained of was harmless. Ewbank's Manual of Practice (2d ed.) § 210. If the error complained of had been rendered harmless by an instruction; the instruction could have been brought into the record by the state, instead of relying upon a presumption, which, in this case, did not exist. Having no reason to believe or presume that the jury was instructed to disregard the objectionable statements, it is not necessary for us to decide if such an instruction would have been sufficient. The statements were not made in the heat of argument and were not erroneous inferences from the evidence, as suggested by the state."

In the case at bar, defendant-appellant's counsel had the right to ask that the opening statements be taken by the official reporter of the court for the preservation of his record. The record discloses the opening statements were not reported and made a part of the record and no attempt was made to complete and make perfect the transcript by showing what was said in the opening statements.

The opening statement by the defense counsel to the jury merely told them what the defense proposed to prove and which was not made under the heat of argument.

Inasmuch as defendant-appellant's opening statement was not evidence and was not part of the record, we have no way of knowing exactly what was said and no question is presented to this court by said specification of the motion to correct errors and we necessarily hold their is no error in the court's ruling.

(S) Improper remarks by the Prosecuting Attorney in his closing argument by references to Superman and Batman, and by comparing the defendant to Richard Speck, a convicted rapist and murderer.

The Prosecuting Attorney, in his closing argument, made a vicious attack on the defendant, saying there was the most serious objective evidence of rape that he had seen in eight and one-half years as Prosecutor; that he had a man up there serving life for that sort of crime and there wasn't a mark on that woman. He remarked further about the marks on the prosecuting witness and choking people into submission. He further said:

"I know that we all would like to feel that we would be cool under similar circumstances, we'd jump up like Superman and Batman and overcome the whole situation. In that regard, let me remind you that one Richard Speck kept eight nurses under a threat, or nine, and took them out individually and molested and killed them."

Mr. Witte objected to the argument as being inflammatory and the objection was sustained by the court. Before the court

was through making its ruling Mr. Witte started to move for a mistrial and the judge asked him to hold up until he had ruled on the first motion. The ruling on the first motion was the sustaining of the objection and the admonishment of the jury that any other case had nothing to do with this case and the jury was instructed to disregard the Prosecuting Attorney's statement and told the attorneys to proceed.

After this, Mr. Witte moved for a mistrial because of the conduct of the Prosecutor, which motion was overruled by the judge.

We are unable to find where the defendant-appellant could have been prejudiced by remarks about Superman and Batman. There is a possibility that some jurors might have been moved by the reference to one Richard Speck, a convicted rapist and murderer. However, it is presumed that the jury fully understands the admonishment of the court and when informed to disregard such statement that they will do so.

In the case of *N. Y. Central Ry. Co.* v. *Milhiser* (1952), 231 Ind. 180, 193, 106 N. E. 2d 453, 108 N. E. 2d 57, our Supreme Court said:

". . . However, in the instant case the judge of the court immediately reprimanded the offender and by very direct and positive instructions directed the jury to disregard the remarks for all purposes in the case. Such an instruction timely made, frequently has been held to correct any injury done by such remarks. . . ."

While this court cannot condone such extraneous and unnecessary remarks of a Prosecuting Attorney, a Prosecuting Attorney in Indiana should refrain from such, yet we are of the opinion that the court was correct in its admonition to the jury and in overruling defendant- appellant's motion for a mistrial.

It is always possible that the most ethical trial attorneys can and in fact do, in the heat of a lawsuit and especially during closing arguments to juries in criminal cases, actually

become carried away and in many instances make remarks which, if permitted to stand, would be prejudicial to the defendant. The rule of law must remain that if, in the discretion of the trial judge, such remarks are not so prejudicial that the defendant cannot get a fair trial, then the trial should continue to completion. It is understandable that some unscrupulous counsel would make such prejudicial remarks that a defendant might never have his trial completed.

(T) Later inflammatory remarks by the Prosecutor were not objected to by defense counsel for fear of turning the jury against the defendant.

Here defendant-appellant's counsel refers to the terms "vengeful tigress" and "she-beast."

It was necessary for us to read the transcript at the lines indicated in the defendant-appellant's brief to understand just what defendant-appellant means by specification (T).

We find from the transcript that the final arguments of the parties were reported and made a part of the transcript.

Defendant-appellant did not make any objection to the Prosecuting Attorney's referring to "vengeful tigress" and "she-beast" and the use in which it was made and he, therefore, did not save his record and is precluded from raising it for the first time in this court.

In the case of *Coakley* v. *State* (1972), 152 Ind. App. 280, 283 N. E. 2d 392, 394, this court said:

"If the remarks by the prosecutor to the trial judge in his summation were improper, Defendant Coakley has waived any error by failing to take any affirmative corrective action. Our courts have repeatedly held that counsel cannot allow error to be committed during trial, unobjected to, and then ask for a new trial after the verdict of judgment has been rendered against him. . . ."

After having read and studied the briefs and the final argument of counsel we can readily understand from the evidence given by the defendant-appellant as to the vicious acts of Miss Hodge that the Prosecuting Attorney or any other

person would be justified in calling her a "vengeful tigress" or a "she-beast," if she did the things she was alleged to have done. We, therefore, find that there was no error in specification (T).

We are of the further opinion that the so-called misconduct of the Prosecuting Attorney is not illustrative of an intentional plan an a patent disregard of his duty as Prosecutor.

It is our opinion that the duty of a Prosecuting Attorney, when he first comes in contact in his official capacity with a criminal case that he must look upon the same and act toward the same with the same impartiality as the judge does throughout all preliminaries and the trial of the cause itself.

It is the duty of the Prosecuting Attorney to represent the person charged with crime with the same zeal and vigor that he may later use for the State in the trial of the cause, to see that that person is not erroneously charged, tried, and convicted, and that all his rights and his freedom are protected. On the other hand, it is also his duty to determine if the person charged with crime is guilty of that crime and from his investigation to determine if he should be prosecuted and if prosecuted, would a conviction be proper.

One of the best tests for a Prosecuting Attorney to perform before vigorously prosecuting one charged with crime and asking that that person's liberty be taken from him is to ask himself "If I were charged with this crime and the State had the evidence which I have available to me and that evidence would be presented against me, then, would I honesty expect to be imprisoned?"

If the honest answer is that he would feel that he should not be imprisoned under that evidence, then he should not prosecute the case and if it were that he honestly believed that he should be prosecuted and convicted and pay his debt to society, then he should not only prosecute the case, but should prosecute it vigorously.

The Prosecuting Attorney, after having made up his mind on the basis aforesaid, when he enters the court room for the trial of the subject defendant and picks a jury should necessarily do so with the same fairness and idealism of the trial judge to be fair with the defendant. After the jury has been selected and sworn, then that same Prosecuting Attorney becomes an advocate. It is then his duty to prosecute honestly and fairly and with everything that he has. For him to do less would be for him to fail to do his duty. However, he should never at any time try to take undue advantage of the defendant in any way for the sake of getting a conviction.

The Supreme Court of the United States, in *Berger* v. *U.S.* (1935), 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314, 1321, states the role of the prosecuting attorney as follows:

> "He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Counsel for defendant-appellant states in his brief that this Prosecuting Attorney has been reversed for the same type of misconduct in previous trials, and that the trial court judge failed to intervene and prevent these breaches of duty by the prosecutor which violated the defendant's right to a fair trial. It is further contended that for these reasons the case should be reversed.

While it is true in our research in this cause we find that this same Prosecuting Attorney did have a case reversed because of his conduct in the trial of the cause, we cannot look to that case for error in the case before us. While the Prosecuting Attorney did go to great length to get a conviction in this case, if any error was committed it was taken care of by the court and was harmless.

Specification No. 2 of Motion to Correct Errors:

Defendant-appellant complains in this specification of error that Charles W. Taylor, a minister, was called by the State for rebuttal evidence. The court asked the Prosecuting Attorney if it would take some time and received the answer "Oh, it could take some time. I don't know whether you'd permit it or not."

Defendant-appellant asked that the jury be excused so they could discuss this matter and the same was done, and the jury then returned to the jury box.

The State was permitted to ask the witness his occupation, to which he answered and the defendant-appellant asked permission to ask preliminary questions, which permission was granted, and he asked the minister if he had any direct knowledge of the alleged rape.

The State at that time told the court that the minister was being offered only as a character witness.

Defendant-appellant objected, on the ground that a character witness for Miss Hodge was not material to the trial. To this remark the judge said "I don't know who's character at this point he is going to testify to. Let him make his record. Objection overruled."

A series of questions and answers followed, where the State asked how long he had been a minister of the East Columbus Methodist Church; if he was acquainted with Katherine Mae Hodge.

The defendant-appellant renewed his objection, which was overruled.

The witness was permitted to testify as to his acquaintance with the prosecuting witness, that she was a member of his congregation and that she had been for about six years, but had not attended church for about six months.

There is further evidence as to her place of residence and that he had called on her as a pastor.

Question by the State:

"And are you generally acquainted with Kathy Hodge's general reputation in this community for morality?"

Defense:
"Your Honor, I'm going to not only object, but move for a mistrial because the Prosecutor well knew before he put the witness on the stand that it was improper."

Judge:
"You're objecting to testimony."

Defense:
"Yes sir."

Judge:
"Objection sustained. Motion for mistrial is overruled."

Defendant-appellant now argues that before the defense's objection to the testimony was sustained the Prosecuting Attorney was allowed to elicit from the Reverend Taylor that the prosecutrix had been in regular attendance at church and that it was obvious he had been called to testify as to the good reputation of the prosecutrix. (The Prosecuting Attorney had already informed the court that he didn't know whether he would let the witness answer the questions or not.) However, the State is entitled to make its case. It had a right to put Reverend Taylor on the stand and the preliminary questions leading up to the question of her reputation for morality were proper. The court correctly ruled when it refused to permit the good minister to answer as to her general reputation for morality when objected to by defendant-appellant's counsel. The fact that he did not testify as to her general reputation for morality saves the record harmless of error on this point and the court properly overruled the motion for mistrial.

Defendant-appellant cites the case of *Leinberger* v. *State* (1933), 204 Ind. 311, 183 N. E. 798. In *Leinberger,* after the defense had rested its case without attacking the reputation of the prosecuting witness, the State was permitted to prove her general reputation for virtue and chastity by a number of witnesses, and the court instructed the jury that

said evidence might be considered by them as affecting her credibility as a witness. Our Supreme Court said:

> "It is well settled in this State that the character and reputation of a witness is presumed to be good until it is attacked, and the witness not having been impeached, the introducting party may not support the testimony of the witness by evidence of general reputation."

In *Leinberger*, the trial court was reversed for permitting this evidence.

We must distinguish the *Leinberger* case from the present case, in that in *Leinberger* the witnesses were permitted to answer. In the case at bar the witness was not permitted to answer.

We know from our practice of law that preliminary questions which are proper such as in this case, laying the groundwork to ask a question which is improper when objected to may be damaging to a party, but still the adverse party has the right to ask those preliminary questions and there is no error if the trial court sustains the objection to the improper question, as was done in the case at bar.

### Specification No. 6 of Motion to Correct Errors.

Under this specification defendant-appellant contends denial of a fair trial and misconduct by the State and uncorrected error of law occurring at the trial by which defendant was prejudiced, when Prosecuting Attorney improperly quizzed the defendant on his counsel's opening statement. That said improper questions were asked for the sole purpose of discrediting the defendant and inflaming the jury. He further contends said question was highly prejudicial, immaterial and irrelevant and constituted a serious breach of the Prosecutor's duty to insure the defendant a fair trial; such highly prejudicial nature of the questions could not be removed from the jury's minds by the court's overruling the defense's objection.

680

Here are set out questions and answers pertaining to ejaculation of the defendant-appellant into the body of the prosecuting witness. The questions and answers are as follows:

State:
"—and this was all done because she got upset because you took too long in reaching a climax. Is that true?"
Witness:
"That is not true."
State:
"Oh, it's not—what is it?"
Witness:
"It is all because I ejaculated in her. She did not want me to."
State:
"She was aware of that at the time?"
Witness:
"She was aware. Yes she was."
State:
"As I recall the opening statement here it was because you took too long."
Witness:
"No, I didn't say that. Not in my opening statement."
State:
"Well, your attorney. I'm asking you what was—"
Defense:
"Your honor, I'm going to object to him cross-examining on my opening statement. If he wants to cross-examine him on what he said, fine."
Judge:
"Objection overruled."
Defense:
"It's not of record and we can't go back and play it."
Judge:
"The objection is overruled, Mr. Witte."

We feel enough has been said pertaining to the ejaculation and the upset condition of the prosecuting witness and the

actions following the same. The matter of the question on the opening statement of defendant-appellant's counsel has been thoroughly discussed in this opinion, under Specification R.

Specification No. 7 of Motion to Correct Errors.

This specification of error claims denial of a fair trial and uncorrected error of law at the trial by which defendant was prejudiced in that State's Exhibit No. "19," the same being a slide or smear taken from the prosecuting witness, Katherine Mae Hodge, at the hospital was improperly admitted into evidence over defendant's objection for the reason that there was not a proper chain of custody established from Dr. Forest Daugherty who took the smear to the time it was in the hands to the pathologist.

It is true that there was not a complete and continuous chain of custody of the smear after it was taken until the report was made on the same and the same showed spermatazoa.

Defendant-appellant relies on the case of *Graham* v. *State* (1970), 253 Ind. 525, 255 N. E. 2d 652, 656. This case holds that the chain of possession must be established to avoid any claim of substitution, tampering or mistake, and that failure to subject such proof may result in the exclusion of the evidence or testimony as to its characteristics.

It must be noted that the case says "failure to subject such proof *may* result in the exclusion of the evidence . . ."

In the case of *Wheeler* v. *State* (1970), 255 Ind. 395, 264 N. E. 2d 600, 603, the evidence introduced at the trial indicated that blood was drawn from the decedent by the coroner, was then handed to a laboratory technician, who placed the blood on the legal shelf of the laboratory refrigerator. Appellant objected to the admission of that evidence because the blood was left unguarded in the unlocked refrigerator for a period of approximately thirty hours. Our Supreme Court quoted from the case of *Guthrie* v. *State* (1970), 254 Ind. 356, 260 N. E. 2d 579, 584:

" 'Appellee has cited several cases the holding of which indicate that all possibility of tampering need not be excluded; upon reasonable assurance that the exhibit has passed through the various hands in an undisturbed condition its admission is proper and any remaining doubts go to its weight only. [Cases cited omitted.]' "

In the case of *McMinoway* v. *State* (1972), 283 N. E. 2d 553, 555, this court passed on the issue of a gap in the chain of evidence. The defendants' possessions were taken from them and placed in three paper bags by the New Albany police after the arrests. The bags were locked in the detective's office, and subsequently given to Trooper Burch, who, in turn, had them placed in a safe in the Harrison County Jail until the time of trial. The questioned situation arose when certain New Albany officers locked the evidence in an office and it was taken out by other officers. The court said:

" '. . . we feel that the location of the bag during the days in question has been sufficiently accounted for. A mere possibility that the evidence could have been tampered with will not make it totally objectionable. Therefore the verdict will not be reversed on the basis of the admissibility of these exhibits.' *Kolb* v. *State*, 258 Ind. 469, 282 N. E. 2d 541 decided may 15, 1972."

In our opinion, the chain of evidence as to the smear slides was adequate that no tampering was shown or even surmised before the pathologist took possession of the smear slides.

The prosecuting witness had testified in direct examination that there was a penetration of her private parts by the defendant's private parts against her will and by force by the defendant. Penetration is one of the essential elements necessary to constitute the crime of rape and the smear of spermatazoa taken from her vagina is merely cumulative evidence and had it been error to admit the exhibit, the error was harmless.

In oral argument defendant-appellant's attorney contended two things: (1) that his client would not have had to have

taken the stand but for the admission of the smear into evidence. With that contention we cannot agree.

This court will not weigh or resolve questions of credibility, but will look to evidence most favorable to the State and reasonable inferences therefrom which support the verdict of the jury. *McMinoway* v. *State, supra.* (2) That the divers items of charged misconduct on the part of the Prosecuting Attorney, taken as a whole, were prejudicial to the defendant and deprived him of a fair trial. We have discussed all the charges of misconduct and are of the opinion that they are not such when taken as a group; their cumulative effect would not be prejudicial and would not be error on the part of the Prosecuting Attorney.

Specifications No. 8 and No. 10 of Motion to Correct Errors.

These are grouped in defendant-appellant's brief and we shall treat them accordingly under Rule AP. 8.3(A)(7).

Specifications 8 and 10 both charge denial of a fair trial and uncorrected error of law by which the defendant was prejudiced in that the court improperly restricted the cross-examination of prosecuting witness Betty Beaman and of the alleged victim. In the cross-examination counsel attempted to elicit from Mrs. Beaman whether, in her opinion, a black person was more apt to commit a crime than a white person. To this the Prosecuting Attorney objected and the objection was sustained.

Under specification 10 the claimed error is that the Prosecuting Attorney objected to a defense question of the prosecuting witness's attitude on dating a black man. Defendant-appellant claimed the objection was erroneously upheld when it was crucial to the defendant to ascertain the prosecuting witness's racial attitude to enable the jury to give the proper credibility to her testimony.

Mrs. Beaman was asked if she approved of the mixing of the races, to which she answered "Absolutely not."

She was next asked the question by the defense:

"Do you feel a black person is more apt to commit a crime than a white person?"

To this the State objected and the objection was sustained.

The court has heretofore, in this opinion, discussed the matter of a witness's testimony pertaining to prejudice of blacks dating whites and we are of the opinion that the same sufficiency covers the objection here and that the defendant-appellant was not prejudiced as claimed in specifications 8 and 10 and that the court properly ruled on the objections made and now contended to be error.

The State's witness, Betty Beaman, had referred to Beverly Baugher, a friend of the prosecuting witness; on cross-examination she was asked if she was aware that Beverly Baugher was dating Tom Palmer, the defendant-appellant, to which she answered that about a month before this happened that her niece came out and discussed it with her. She was next asked if she disapproved of this and her answer was "yes." The State objected and the judge ruled that the question had been answered. The question had been asked and answered before the objection was made. The State, to have saved its records, should have moved that the answer be stricken from the record for the purpose of objection. After the answer was stricken and the court had admonished the jury to disregard the answer, then the Prosecuting Attorney could have stated his objection and then the court would have ruled.

The prosecuting witness, Katherine Mae Hodge, on cross-examination concerning her relationship with her girl friend, Beverly Baugher, and her attitude toward black people, testified that Beverly Baugher's parents had not even known that she (Beverly) was dating Tom Palmer and now that the alleged rape had happened, Beverly still did not want them to know and the only one who knows is her mother and she

doesn't want her father to find out about it. The defense asked the following question:

"Is that because he is black?"

to which the witness answered "Yes."

Defense:
 "Have you ever dated a black man?"

Witness:
 "No."

Defense:
 "Are you against black people?"

State:
 "I'm going to object to that as being immaterial to this case."

Defense:
 "I think, Your Honor, this is cross-examination and quite relevant and goes to why this story has been told."

Judge:
 "Objection overruled. I'll let her answer that question."

Witness:
 "Yes I am—"

There were further questions and answers along this line, showing disapproval by the prosecuting witness of white women dating black men and that Beverly Baugher's and the prosecuting witness's friendship cooled off following the alleged rape.

Defendant-appellant further argues: "Both questions posed to the Prosecutrix and her aunt were material and relevant to show bias on their part against the black race as a whole and had a direct bearing on the defendant specifically."

From his own admission in his brief, he already had in the record that the witness, Betty Beaman, and the prosecutrix were racially prejudiced and it is he who made the attempt to introduce cumulative evidence thereon to prejudice the jury against the prosecuting witness and her aunt, Betty Beaman.

In our opinion, the further examination on this point by defendant's counsel would have been highly prejudicial to one or both sides and that the court properly refused further evidence of prejudice against a party because of race or color.

Specification No. 11 of Motion to Correct Errors.

Defendant-appellant under this specification claims denial of a fair trial and uncorrected error of law at the trial which prejudiced the defendant by the court improperly pemitting the admission into evidence over defendant's objection of State's Exhibits 6, 7, 8, 9, and 10, the same being photographs of the prosecuting witness. He further contends that said photographs were improperly admitted as they were not authenticated by the photographer who took them, and they were repetitious and inflammatory.

The record discloses that these exhibits are photographs of Kathy Hodge taken about 9 o'clock A.M. on the day of the alleged rape of her by the defendant-appellant. Exhibits 6 and 7 are photographs exposing the left side of her face and one exposes the left side of the back of her neck. Exhibit 8 is a photograph exposing her face with her chin held high, exposing her neck. Exhibit 9 is a photograph of the right side of the face and principally marks on the right side of her neck and State's Exhibit 10 is a photograph of the right side of her face, exposing her from the ear down to and including the upper part of the right shoulder.

Each of these color photographs exposes discolored marks, some the size of the tips of fingers and some of them two or three inches long, and the overall display by the exhibits show marks on the back of her neck, her throat at the sides, her chin, her face on the left side, her throat at the Adams apple, and her right shoulder.

Defendant-appellant relies on the case of *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N. E. 2d 899, where the court said that photographs which are repetitious, cumulative and grue-

some in character are admissible only if they serve to elucidate and explain relevant oral testimony or tend to prove or disprove some material fact in issue. With that statement of the law we wholeheartedly agree. The photographs in this case were merely corroborative evidence of the choking of the prosecuting witness by the defendant-appellant. The prosecuting witness testified that she was choked and these marks were made on her neck to force her submission to the sexual desires of the defendant-appellant. The defendant-appellant, as heretofore stated, testified that the prosecuting witness had freely consented to have sexual intercourse with him and that when he ejaculated she grabbed him by the testicles and hit him in the head with a heavy object and that he did grab her by the throat in self defense in order to get her to release her grip on his private parts.

In our opinion, the pictures are neither repetitious, cumulative nor gruesome, but they do show that the prosecuting witness had been choked or struck on the neck and shoulders with sufficient force that the marks remained for a few days, according to medical evidence submitted at the trial. In our opinion, there was no error in the admission of said photographic exhibits.

This court having determined that there was no error in the record, it was necessary to write on each specification raised by the defendant-appellant in his motion to correct errors. Hence, this opinion is unduly long.

The facts of the incident set out in the opinion are set out in detail and at length because the story of the prosecutrix was directly opposed to the story of the defendant-appellant. If the jury believed the evidence of defendant-appellant then he was not guilty of rape; if the jury believed, beyond a reasonable doubt, the evidence of the State, then the defendant was guilty of rape. Each of the stories was outlined to show that the evidence was such that reasonable men's minds could come to different conclusions. It was for the jury to

determine whom they would believe and whom they would disbelieve.

It being the law that this court will not weigh or resolve questions of credibility, but will look to the evidence most favorable to the State and reasonable inferences therefrom which support the verdict of the trial court or the jury, we will not weigh the evidence or resolve the question of credibility. However, in looking to the evidence most favorable to the State and reasonable inferences therefrom which support the verdict of the jury, we find there was sufficient evidence that the defendant was proved guilty as charged beyond a reasonable doubt.

Judgment affirmed.

Robertson, P.J., and Lybrook, J., concur.

NOTE.—Reported in 288 N. E. 2d 739.