**Janet SHANHOLT, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 3–582A106.**

Court of Appeals of Indiana, Third District.

April 27, 1983.

Rehearing Denied June 7, 1983.

Susan K. Carpenter, Public Defender of Ind., M.E. Tuke, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Gordon R. Medlicott, Deputy Atty. Gen., Indianapolis, for appellee.

HOFFMAN, Presiding Judge.

Janet Shanholt was convicted by a jury of child confinement, a class D felony, pursuant to Ind.Code § 35–42–3–3 (Burns 1982 Supp.) and received a sentence of four

years. In appealing her conviction, Shanholt presents ten issues for review:

(1) whether the order that served as a basis for the allegation of unlawful conduct was void and whether, therefore, the trial court erred in denying Shanholt's motion based on Ind.Rules of Procedure, Trial Rule 50;

(2) whether the trial court erred in failing to reduce Shanholt's bond, thereby prejudicing her in the preparation of her case;

(3) whether the trial court erred in permitting evidence pertaining to homosexual activity;

(4) whether the trial court erred by denying Shanholt's motion to redact portions of State's Exhibit No. 1;

(5) whether the trial court erred by excluding the hypothetical question and answer propounded to Dr. Turkewitz;

(6) whether the trial court erred in permitting the testimony of Marjorie Cohen and Robert Suntheimer;

(7) whether the trial court erred in refusing Shanholt's tendered Instruction No. 6;

(8) whether the trial court permitted prosecutorial misconduct in the final argument;

(9) whether the trial court denied Shanholt the right of allocution before sentencing her; and

(10) whether the trial court imposed a manifestly unreasonable sentence.

Daniel and Janet Shanholt were married on March 8, 1969, and were divorced on September 15, 1976. Two children were born of the marriage, Dawn and Julie, who were 12 and 9 years old respectively at the time of the trial. Daniel was awarded custody of the girls but there was extensive litigation both before and after the award concerning custody and visitation.

The most recent modification on June 4, 1981, permitted Janet to remove the two daughters from Daniel's home for visitation on Saturdays and Sundays from 2:00 P.M. to 6:00 P.M. On the afternoon of June 13, 1981, Janet went to Daniel's home, accompanied by Karen Nadolny, took the girls, and left, driving a red van. Instead of returning the children at the time appointed by the decree, Janet and Karen traveled with the girls to Tucson, Arizona.

Dawn and Julie testified that they asked their mother to take them home, but she refused. Finally, once in Tucson, the girls told some neighbors of their plight. The FBI went to the motel where they were living and arrested Karen, then went to the bowling alley where Janet worked and arrested her. The children were taken to a convent for the night and were returned by airplane to their father, almost a month after they were taken.

Janet's defense was that she believed this was the only way to salvage her relationship with the children and to protect them from physical and psychological abuse by their father and his wife.

Daniel and his daughters rebutted this testimony. However, the girls and other witnesses testified that Janet and Karen had struck the girls. Julie testified that the bruises on her, which Janet alleged were made by Daniel, were actually drawn on her by Janet with magic markers.

Dawn suffers from an epileptic condition for which she is under constant medication. Yet Janet took none of Dawn's medicine with them when she took the children. Dawn further testified that while in their Arizona motel room she observed sexually suggestive activity between Janet and Karen.

Janet was charged by information as follows, omitting formal parts:

"The undersigned affiant swears that on or about the 13th day of June, 1981 at the County of Elkhart and State of Indiana, one JANET SHANHOLT and one KAREN NADOLNY, they and each of them, did, then and there unlawfully, knowingly and intentionally and feloniously, remove two minor children, namely: Dawn Shanholt and Julie Shanholt, by fraud and enticement from one place to anoth-

er; and did remove said children who are under the age of eighteen (18) years of age to a place outside of Indiana in violation of a child custody order of the Elkhart Superior Court No. 1 of Elkhart County, Indiana, under Cause Number 44368, and the said JANET SHANHOLT and KAREN NADOLNY, and each of them, did then commit the criminal offense of criminal confinement by picking up the children at 2:00 P.M. on Saturday, June 13, 1981, and they and each of them indicating that the children would be returned pursuant to the court order in the Elkhart Superior Court No. 1, Cause Number 44368, at 6:00 P.M. on June 14, 1981. Further, that JANET SHANHOLT and KAREN NADOLNY failed to return the children, thus causing the removal of the children from one place to another by fraud and enticement. Further, that JANET SHANHOLT and KAREN NADOLNY then moved the two children from the State of Indiana in violation of the child custody order previously mentioned. All of the above acts were initiated in Elkhart County, Indiana and are contrary to the form of Indiana Code section 35–42–3–3; contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Indiana.

/s/ ————————
Barbara Cutter"

*Record* at 5–6.

The statute under which Janet was convicted contains three sections.

"35–42–3–3. Criminal confinement.—

(a) A person who knowingly or intentionally:

(1) Confines another person without his consent;

(2) Removes another person, by fraud, enticement, force, or threat of force, from one place to another; or

(3) Removes another person, who is under eighteen [18] years of age, to a place outside Indiana when the removal violates a child custody order of a court;

commits criminal confinement, a class D felony. However, the offense is a class C felony if the child is not his child, and a class B felony if it is committed while armed with a deadly weapon or results in serious bodily injury to another person. (b) With respect to the violation of subdivision (a)(3) of this section, it may be considered as a mitigating circumstance if the accused person returned the other person to the custodial parent within seven [7] days of the removal."

Janet contends that the custody order she is charged with violating was void because the special judge did not have jurisdiction and, therefore, the order could not form the basis for a criminal prosecution.

■ A.J. Spahn was appointed and qualified as special judge in the domestic relations cause on August 24, 1977 to hear and rule upon pending motions to modify custody and support. His final ruling on the motion to correct errors came on December 22, 1978. Upon entering an appealable order, the jurisdiction of a special judge is terminated. While the *court* has continuing jurisdiction in such cases, the special judge does not. It has therefore been said that any subsequent proceeding before him is void. *State ex rel. Cannon v. Bitzegaio* (1968), 250 Ind. 516, 237 N.E.2d 366; *Heller v. Heller.* (1962), 133 Ind.App. 259, 181 N.E.2d 530.

■ In this instance, no objection was made by either party to Judge Spahn's jurisdiction over the modification proceedings until this criminal action arose. In fact, the parties stipulated to his jurisdiction. We are aware of cases which say that parties cannot, by agreement, confer judicial authority upon a person. *See State, ex rel. Eggers v. Branaman* (1932), 204 Ind. 238, 183 N.E. 653; *Herbster v. The State* (1881), 80 Ind. 484. We are also aware of cases which hold that where a judge acts under color of authority and the parties voluntarily go to trial without objection, an objection after the judgment is rendered is deemed to be too late to be of avail. *See Moerecke v. Bryan* (1915), 183 Ind. 591, 108 N.E. 948; *Smurr v. The State* (1886), 105 Ind. 125, 4

N.E. 445. Unlike lack of jurisdiction over the subject matter, lack of jurisdiction over a particular case may be waived unless a timely objection is made. *State ex rel. Sacks Bros. Loan Co. v. DeBard* (1978), 177 Ind.App. 679, 381 N.E.2d 119; *Farley v. Farley* (1973), 157 Ind.App. 385, 300 N.E.2d 375.

The answer to the dilemma lies with two cases decided by this Court in 1921: *Michigan, etc., R. Co. v. S.J. Peabody Lumber Co.* (1921), 76 Ind.App. 222, 131 N.E. 841 and *Evans v. Rutherford* (1921), 76 Ind.App. 366, 131 N.E. 55. In *Michigan, etc. R. Co.* this Court held:

"Appellee seeks to have the appeal in this cause dismissed on the ground that the record shows that the issues were settled before the regular judge of the Whitley Circuit Court, while the cause was tried before a special judge, without disclosing any change of venue, or the appointment of such special judge. These facts afford no ground for dismissal, as *it is well settled that where the record is wholly silent as to the appointment of a special judge, a presumption will arise that it was duly made, and if his authority is not questioned until after a trial is had and a judgment rendered, all objections, based on the absence of an appointment in conformity with the statute, which might have been properly and possibly successfully made, if timely presented, will be deemed waived.* Kennedy v. State* (1876), 53 Ind. 542; *Zonker v. Cowan* (1882), 84 Ind. 395; *Kenney v. Phillipy* (1883), 91 Ind. 511; *Schlungger v. State* (1888), 113 Ind. 295, 15 N.E. 269; *Bartley v. Phillips* (1888), 114 Ind. 189, 16 N.E. 508; *Lillie v. Trentman* (1891), 130 Ind. 16, 29 N.E. 405; *Larrance v. Lewis* (1912), 51 Ind.App. 1, 98 N.E. 892; *Pottlitzer v. Citizens Trust Co.* (1915), 60 Ind.App. 45, 108 N.E. 36; *Folger v. Barnard* (1919), 73 Ind.App. 523, 125 N.E. 460." (Emphasis added.) 76 Ind.App. at 227, 131 N.E. at 843.

This was discussed a short time earlier in *Evans:*

"Questions with reference to the authority of persons, assuming to act as special judges, have been before the Supreme Court of this state frequently, but varying more or less as to the facts involved. From a consideration of these decisions, we conclude that it has been fully determined that where statutory authority exists for the appointment of special judges, and a cause is tried before one assuming to act as such, it will not be presumed on appeal that he usurped such office; that if the record is wholly silent as to his appointment, a presumption will arise that it was duly made, but if facts appear which rebut such presumption, it will be presumed nevertheless, the contrary not appearing, that such an appointment was made as to give him color of right in assuming jurisdiction of the cause; that in such an event he becomes a *de facto* judge, and, if his authority is not questioned until after a trial is had and a judgment is rendered, all objections, based on the absence of an appointment in conformity with the statute and due qualification, which might have been properly, and possibly successfully made, if timely presented, will be deemed waived." (Citations omitted.) 76 Ind. App. at 371, 131 N.E. at 56–57.

Likewise the record here was wholly silent as to Judge Spahn's re-appointment before hearing each subsequent motion, and his authority was not questioned until after judgment was rendered. Therefore, we must presume that he was duly appointed and waive any objection.[1]

 Janet also contends the charging information was fatally defective because it was duplicitous. She argues that the State attempted to combine elements of Ind.Code § 35–42–3–3(a)(2) and Ind.Code § 35–42–3–3(a)(3) in the document, thus creating a "hybrid" offense.

1. Ind.Rules of Procedure, Trial Rule 79(15) now provides for continuing jurisdiction by a special judge. However, that amendment was made in 1980 and Judge Spahn's first ruling came in 1978.

This Court previously determined that in view of the dissimilarity between the elements of proof, sections (a)(1) and (a)(2) present two separate crimes. *Addis v. State* (1980), Ind.App., 404 N.E.2d 59. Section (a)(3) was not discussed in *Addis*; however, different acts and elements are required to be proven for this section and therefore it too presents a separate offense.

The charging information which contains elements of IC 35–42–3–3(a)(2) and IC 35–42–3–3(a)(3) is not duplicitous, as Janet alleges. A similar problem arose and was decided by the United States Court of Appeals, Ninth Circuit in *United States v. Amick* (1971) 439 F.2d 351, *cert. den.* 403 U.S. 918, 91 S.Ct. 2227, 29 L.Ed.2d 694. Citing *Crain v. United States* (1896) 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097 and *Troutman v. United States* (10th Cir.1938) 100 F.2d 628, the Court held:

> "The statute thus embraces in the *disjunctive* three separate and distinct acts as a crime. The indictment charges the three offenses in the language of the statute, but they are charged in the *conjunctive.* An indictment charging a statutory offense must follow the statute creating it; *but where the statute denounces several acts as a crime, they may be charged in one indictment or in a single count if they are connected in the conjunctive.* An indictment drawn in that manner is not duplicitous, and it suffices to prove any one or more of the charges." (Emphasis added.) 439 F.2d at 359.

This principle has likewise been adopted by the Supreme Court of Indiana. *See Smith v. State* (1960), 241 Ind. 1, 168 N.E.2d 199 and the cases cited therein.

IC 35–42–3–3(a) also contains three separate offenses which are written in the disjunctive. However, the information charged elements from two of the offenses in the conjunctive. Therefore, the charging instrument was not duplicitous, and it was sufficient for the State to prove either the removal of the children by fraud and entice-

ment from one place to another or their removal to a place outside of Indiana in violation of a custody order.[2] No hybrid offense was created and the charging information was valid.

Next Janet argues that the trial court erred in failing to reduce her bond to a reasonable level, thereby prejudicing her in the preparation of her case. Bail was originally set at $25,000 but was reduced to $10,000 after a reduction hearing.

▮ The amount of bail set is within the sound discretion of the trial court. *Holland v. Hargar* (1980), Ind., 409 N.E.2d 604. Although Janet petitioned for release on her own recognizance, she alleged in her petition and again argued in her appellate brief that the $25,000 originally set was 2½ times the bail ordinarily set in such a case. This was the amount to which the trial court subsequently reduced her bond; yet she was still displeased.

The pretrial release report presented the trial court with the information that Janet had no permanent residence in the community and no present income or job in the community. She also had other causes of action pending against her. In light of these factors and the fact that the crime with which she was charged involved her previous departure from Indiana, the sum set was reasonable under the circumstances to secure her appearance. No abuse of discretion occurred.

▮ Janet next contends the trial court erred in permitting evidence pertaining to homosexual activity which was improper and severely prejudicial. Specifically, Janet points to three instances in the record. The first of these occurred during cross-examination of Karen Nadolny by the State:

> "Q Could you describe your relationship with the defendant, Janet Shanholt?
>
> "A We're very close friends.
>
> "Q Okay. Does it go beyond being friends?

---

**2.** Janet challenges only the charging instrument and not the sufficiency of the evidence

presented at trial.

MR. MURTO: I believe I must object, your Honor.

MR. WHISLER: Your Honor, we're attacking the bias of this witness for the jury. The jury needs to see this kind of evidence and understand why—

THE COURT: (Interrupting) I haven't heard the objection yet, Mr. Whisler.

MR. WHISLER: Excuse me.

MR. MURTO: I think the state has accomplished what it can accomplish. Any other kind of questions can only be unduly prejudicial to this witness without any particular relevance to show additional bias. She's stated from the start she's a close friend and has known Jan a long time.

THE COURT: Mr. Whisler?

MR. WHISLER: Your Honor, the jury is going to have to weigh the facts and determine the credibility of the witnesses. And in order to do that they'll have to understand the biases of the different witnesses who testify. If this witness has a bias for the defendant, I think the jury needs to know exactly how far that bias that's what the question is directed at only.

THE COURT: I'll overrule the objection.

"BY MR. WHISLER:

"Q I think the question was does your relationship with Janet Shanholt go beyond being more than mere friends?

"A No.

"Q Have you ever had a homosexual relationship with the defendant?

"A No, I have not.

MR. MURTO: Objection, your Honor. Objection, this is unfounded. The state will not be able to establish that; therefore, it is clearly unduly prejudicial.

THE COURT: I think it assumes a fact that's not in evidence, but she's already answered the question.

MR. MURTO: I move that it be struck then.

MR. WHISLER: Your Honor, the state on rebuttal would be able to offer evidence on that point.

MR. MURTO: I think this is of such a nature that it would require an in camera hearing before the Court could allow it to proceed.

MR. WHISLER: Fine.

THE COURT: In any case she's already answered the question in the negative."

*Record* at 428–430.

The second incident arose during cross-examination of Janet by the State:

"Q Could you describe your relationship with Karen Nadolny, please?

"A Yes. We're very close friends.

"Q Okay. Are you more than just friends?

"A What do you mean 'by more than just friends?

"A [sic] Okay. Have you ever had a homosexual experience with Karen?

"A Absolutely not.

"Q Never?

"A No.

"Q Okay. Nothing of the kind?

"A Nothing of the kind.

"Q Okay. You don't have the feeling that Carol would do practically anything for you?

"A Carol?

"Q Excuse me, that Karen would do practically anything for you?

"A Short of perjure herself, yeah."

*Record* at 567–568.

And the last reference came during the State's rebuttal with Dawn:

"Q While you were out in Arizona, did you ever see Karen and your mother together?

"A Yes.

"Q Okay. Could you describe that incident to the jury?

"A They were in the bedroom together in an unmannerly way.

"Q Okay. Now, Dawn, I know this is embarrassing for a pretty little girl like you to even have to say this to these 12 people, okay, but it is necessary. Karen and Janet together. Is that okay?

"A (No audible response.)

"Q Okay. Can you tell the jury whether, at the time you saw them together in the bedroom, were they dressed?

"A No.

"Q Okay. What clothes did they have on?

"A I don't believe that my mother had anything on but—and if Karen had anything it was like a bra and underware [sic].

"Q Okay. What did you observe happen at that time?

"A When. I was in there, they weren't fully dressed, I remember, and my mother was sucking on her breast.

"Q Okay. This is your mother was sucking on Karen's breast; is that what you just said?

"A Yes.

"Q Okay. And you're sure that that's what was going on?

"A Yes.

"Q Okay. Have you ever seen anything else like that between the two of them?

"A Yes.

"Q On how many other occasions?

"A There was a lot of times before she had taken us away from Elkhart.

"Q Okay. Did you like the way that Karen and Janet would carry on like that?

"A No."

*Record* at 649–650.

The record clearly shows that in the latter two instances, no objection to the testimony was made by Janet. No continuing objection was on record. It is well settled that an objection to allegedly improper testimony must be made at the point in the trial where the evidence is offered or the improper question is asked. The failure to object, as in this case, waives any claim of error. *Smith v. State* (1983), Ind., 443 N.E.2d 1187.

 The State contends that Karen was asked to describe her relationship with Janet in order to demonstrate a bias on her part toward Janet. A witness's bias, prejudice or ulterior motives are always relevant at trial in that they may discredit her or affect the weight of her testimony. *Pfefferkorn v. State* (1980), Ind.App., 413 N.E.2d 1088. Indiana has long allowed evidence of bias or prejudice by a witness, although the trial court is granted discretion in the admission of such evidence. Evidence of bias is not collateral in nature, nor is it limited to the scope of direct examination. *Hunter et al. v. State* (1977), 172 Ind.App. 397, 360 N.E.2d 588, U.S. *cert. den.* 434 U.S. 906, 98 S.Ct. 306, 54 L.Ed.2d 193. Not only is such evidence merely allowed by Indiana law, it has been held that a party has a right to cross-examine an opposing party's witness on matters which tend to impair that witness's credibility or to show her interest, bias, or motives. *Guise v. State* (1977), 171 Ind.App. 680, 359 N.E.2d 269. The revelation of bias on the part of a witness is a legitimate and often essential goal of cross-examination. *Duncanson v. State* (1979), Ind.App., 391 N.E.2d 1157.

Furthermore, evidence of personal relationships has been accepted as being indicative of bias. *See Wireman v. State* (1982), Ind., 432 N.E.2d 1343; *Palmer v. State* (1972), 153 Ind.App. 648, 288 N.E.2d 739. The questioning of Karen was relevant to establishing her bias, and the trial court did not err in overruling Janet's objection.

 The fourth error alleged by Janet was the trial court's denial of her motion to redact portions of State's Exhibit No. 1, a certified docket entry of the Shanholts' divorce and subsequent child custody proceedings. Specifically, Janet takes issue with entries relating to her volunteering to take a polygraph examination and the parties' stipulation that the trial court could consider the results of the examination in arriving at its decision. Janet contends that the entries had no relevance to the case and that she was prejudiced by them since at the point in the trial at which the docket was introduced, there was no valid issue of credibility.

A review of the record reveals the following motion by defense counsel at the time the State moved for introduction of the document into evidence:

"MR. MURTO: Your Honor, with respect to the state's motion to publish the document to the jury, I would have a motion to redact with respect to two areas, not including the June 4th entry. If I might point those out to the Court.

(There was a side bar conference.)"

*Record* at 346.

The record fails to reveal what was discussed at the "side bar conference." The record also fails to reveal any specific objection to the portions of the document now complained of having ever been made. Therefore, any error in admitting the entire document is waived due to a lack of a timely and specific objection at trial. *Pounds v. State* (1983), Ind., 443 N.E.2d 1193.

 The testimony of Dr. L. Jay Turkewitz, the physician treating Dawn for her epilepsy, was admitted by way of the reading of his deposition given prior to trial. Janet asserts that the trial court erred by excluding the following hypothetical question given Dr. Turkewitz and his answer:

"Q Okay. This is a hypothetical question.

"A Is this the last question on the sheet?

"Q No, this is a different one. I didn't send it to you because I wanted to present it to you now and while we were involved in a matter that is litigation here. But it has some of the same conditions in it as that last question. If a child such as Dawn is an epileptic and she resides with her father and stepmother, she has custodial visitation with her mother on alternate weekends and even frequently at other times, and if her father and stepmother have carried on a sustained effort to poison her mother in the child's mind, and if upon her return from visitation her father and stepmother subject the child to interrogation concerning the visitation in an effort to discover defamatory information about the mother and her relationship with the child, and if her father and stepmother encourage the child to act spitefully toward her moth-er during visitation and in other communications with her mother, and finally if the visitation is discontinued or abbreviated, what would be your opinion about the effect, if any, of the discontinuation of the visitation upon the epileptic condition or the symptoms of epilepsy presented by the child—

"A (Interrupting) I think it would improve the situation, because what you're describing is a hypothetical situation where the father's acting inappropriately and creating a stressful situation. The child is torn between the love and desire to please the father and that natural bond that we all feel towards our maternal mother. That would create a tremendous psychic conflict.

And certainly, even at the point of not seeing the mother, the maternal mother, it might improve the seizures, if there was a strong emotional component to bring on the seizures, just by taking away the stress and conflict that the father was putting on the child.

"Q Thank you."

*Record* at 597.

Janet argues that the exclusion of this testimony impaired her ability to demonstrate the validity of her concern about the wellbeing of Dawn while in her father's custody and thus, her motivation for removing the children.

The deposition of Dr. Turkewitz was offered and read into evidence by the defense. The State made no objection. The record shows no objection ever having been made by the State either during the trial, during the deposition, or at any other time. Without the aid of a crystal ball or any explanation in Janet's appellate brief, this Court is at a loss to understand why a portion of the deposition, which was read into evidence by the defense, was left out by the defense, and why such omission is now complained of by the defense. Therefore, we are also at a loss to find any error in the omission.

Hence, we proceed to the next error alleged by Janet. She contends that the trial court erred in permitting the testimony of Marjorie Cohen and Robert Suntheimer because the witnesses were not previously disclosed to the defense and their testimony went beyond the scope of proper rebuttal.

Once again the record is silent as to any objection being made by the defense either before or during the testimony of Marjorie Cohen. It hardly needs repeating therefore that any alleged error with respect to her testimony is waived. *Pounds, supra.*

A proper objection was made prior to the testimony of Robert Suntheimer and was overruled. The law in Indiana is clear that a trial court may permit a witness to testify although he was not previously named on the list of witnesses. This is especially true as to a rebuttal witness, as in this instance, inasmuch as the State cannot be expected to anticipate the witnesses that it will call for that purpose. *Thompkins v. State* (1978), 270 Ind. 163, 383 N.E.2d 347.

Suntheimer testified as to incidents wherein he had observed Janet striking the girls and on one occasion she kept pushing Dawn's head under water while Dawn screamed for help.[3] Janet had previously denied any such action on her part.

The State offered Suntheimer's testimony for impeachment purposes. It was not admitted as evidence of Janet's actions,[4] but rather to establish the lack of truthfulness in her earlier testimony. Therefore, it was proper rebuttal evidence.

Had the State wished to introduce the evidence to rebut Janet's defense, that too may have been proper. When a defendant attempts to prove a factual defense which justifies his actions, specific acts of prior conduct are admissible to rebut the defense. *Jackson v. State* (1977), 267 Ind. 62, 366 N.E.2d 1186, *cert. den.* 435 U.S. 975, 98 S.Ct. 1623, 56 L.Ed.2d 69.

The seventh issue raised by Janet was whether the trial court erred by refusing her tendered Instruction No. 6 regarding inferences to be drawn from the evidence and the presumption of innocence.

In reviewing a tendered instruction which has been refused, it is necessary to determine whether the instruction correctly states the law, whether there is sufficient evidence in the record to support the giving of the instruction, and whether the substance of the disputed instruction is covered by other instructions which were given. *Beck v. State* (1981), Ind.App., 414 N.E.2d 970.

The only question here is whether the tendered instruction was covered by other given instructions, and we find that it was. Final Instructions Nos. 7, 10, 12, 13, and 14 all deal in some way with the subject matter contained in Janet's tendered Instruction No. 6. It is not error to refuse to give an instruction when the subject matter of the instruction is adequately covered by other instructions already given. *Short v. State* (1982), Ind., 443 N.E.2d 298.

Janet also contends that the trial court permitted prosecutorial misconduct in the final argument, thus placing her in a position of grave peril. In her appellate brief, Janet complains of several remarks made during final argument. Three of the paragraphs discussed were excerpted from the final argument of *defense counsel.* We fail to understand her complaint with these.

Another statement, which was at least made by the prosecutor, was made without objection. Thus, any possible error was waived. *Dean v. State* (1982), Ind., 433 N.E.2d 1172.

The only objection made came later in the argument:

"My job at this time is about done. You have the evidence before you, all that Mr. Murto and I could possibly get before you. The jury's job is just commencing.

---

3. We note at this point that no objection was made by the defense to the actual questions asked or answers given by Suntheimer.

4. Impeachment evidence is not substantive evidence. *Glover v. State* (1970), 253 Ind. 536, 255 N.E.2d 657.

When I shave tomorrow I'll know that I did the best I could in presenting to you the evidence. As jurors you are the moral conscience of society. The jury must decide if the defendant is guilty or innocent as they represent the entire county of Elkhart.

When you go home and you read in the papers and you say, how awful all of this is, where are the police, where are the prosecutors—

MR. MURTO: (Interrupting) Objection, your Honor. This is not the nature of proper argument to the jury.

THE COURT: Objection's overruled."

*Record* at 700–701.

This objection fails to properly present a question to the trial court. It is a general objection with no reasoning given for it. The statement here was not sufficiently specific to have placed before the trial court the legal grounds upon which Janet was relying in making the objection. Specific grounds for an objection must be stated in order to preserve the issues for appellate review. *Wells v. State* (1982), Ind., 441 N.E.2d 458.

■ Furthermore, this Court fails to find the prosecutor's remarks so inflammatory as to place Janet in a position of grave peril. *See Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843. The prosecutor did not request the jury to convict Janet for a reason other than her guilt; he merely emphasized the important role of the jury in our judicial system.

■ Janet next argues that the trial court erred by denying her the right of allocution before imposing sentence. Janet contends that after addressing specific questions to her, which she answered, and after allowing her counsel to question her and to present arguments for her, the trial court immediately pronounced sentence without offering her the opportunity to make a statement to the court. She asserts that this violated the mandate of Ind.Code 35–4.1–4–5 (35–50–1A–5 in Burns), a statute regarding sentencing procedure.

Although the trial court did not explicitly ask Janet whether she wished to make a personal statement on her own behalf, she made one nonetheless. After answering questions posed to her both by the trial court and by her counsel, the record indicates nine pages worth of argument made on Janet's behalf by her counsel. Then, Janet was given the following opportunity to explain herself:

"THE COURT: There's a statement in the presentence report that has not been corrected and that statement is that you do not feel that you were guilty of child confinement and because of this you do not feel that you did anything wrong. Is that still your feeling?

"THE DEFENDANT: It's a little bit out of context, but basically yes. And if I might explain, I feel that what I did I did because I had no other choice and because of the legality, the arguments, continually about what the law actually is and how it applies in this case. No, I feel morally I have not done anything wrong. I think it's at least questionable as to whether I have legally.

"MR. MURTO: I want to add something to that, your Honor. I've talked an awful lot throughout this case about the legal process and explained many of the aspects of this, ways which will be foundation for appeal, and I predicted very early that we would end up with an appeal.

I think that constitutes a large part of Janet's statement that she just made. I don't mean to undermine the authority of the Court by doing that either, I'm trying to give her the best defense possible.

"THE COURT: I certainly appreciate that and do not wish to do anything undermining that. I was just trying to get into her thought process of what occurred rather than the legalities of what occurred, how she herself felt about the incident and how she herself felt about the incident after talking to some psychologists and psychiatrists.

"MR. MURTO: I might ask a couple more questtions then, see whether it has made any difference.

Have you had a chance to talk with either Dr. Price or Dr. Funk about any other kind of an action that you can take in the future other than removing your children as you did last summer?

"THE DEFENDANT: Yes, I have. I've talked to them both about counseling at Oaklawn, not only for myself but the children as well.

Al Spahn had ordered it and to the best of my knowledge it has still not been done. That would be one area that would help them deal with the situation.

And at the same time I've been made aware by the probation officer, Nancy Roytek, that there's a gentleman that does, I believe he's a part of the welfare department of the court, regarding dissolution and custody battles, that does nothing but investigate this kind of situation and try to make a determination as to where the children should be placed.

And I think those are the two areas that haven't really been opened up before. There would certainly be some option there to look into and try to go off in that area."

*Record* at 738–740.

Janet was clearly given a full-blown sentencing hearing and in no way was she stifled. The purpose of a sentencing hearing is to give the trial court the opportunity to consider the facts and circumstances relevant to the sentencing of the individual defendant before it. *Page v. State* (1981), Ind., 424 N.E.2d 1021. This goal was accomplished in Janet's sentencing hearing and she was given the opportunity to explain her view of the facts and circumstances throughout the hearing. Janet has failed to demonstrate what more she wished to add or how she was harmed by the way in which her sentencing hearing was conducted.

Finally, Janet proposed that the trial court erred in imposing a manifestly unrea-sonable aggravated sentence upon her and by failing to consider mitigating circumstances. Janet was convicted of a class D felony, the sentence for which is provided in IC 35–50–2–7:

"Sec. 7. (a) A person who commits a Class D felony shall be imprisoned for a fixed term of two (2) years, with not more than two (2) years added for aggravating circumstances; in addition, he may be fined not more than ten thousand dollars ($10,000).

(b) Notwithstanding subsection (a) of this section, if a person has committed a Class D felony, the court may enter judgment of conviction of a Class A misdemeanor and sentence accordingly. The court shall enter in the record, in detail, the reason for its action whenever it exercises the power granted in this subsection."

She was sentenced as follows:

"I'm going to sentence you to the Department of Corrections for a period of four years. I'm going to find as aggravating circumstances that your children were the victims of the crime you committed and that they were obviously minors.

I think that you have a history of criminal activity that is further supported by the fact that you have two charges pending against you right now in the Goshen City Court; that you have a prior felony conviction.

I think you are in great need of rehabilitation and I hope you can find that rehabilitation within the Department of Corrections."

*Record* at 742–743.

The criteria for sentencing are set forth in IC 35–4.1–4–7, however that statute explicitly states that the trial court may consider factors other than those listed. It is within the trial court's authority to determine the weight to be given aggravating and mitigating circumstances and to increase or decrease the sentence accordingly. *Abercrombie v. State* (1982), Ind., 441 N.E.2d 442. Here the trial court obviously gave more weight to the aggravating circumstances presented than to the mitigating ones.

An appellate court will not adjust a sentence which is authorized by statute and which is not manifestly unreasonable in light of the nature of the offense and the character of the offender. A sentence is not manifestly unreasonable if any reasonable person could find the sentence to be appropriate to the particular offense and offender. *Johnson v. State* (1982), Ind., 432 N.E.2d 403. The trial judge in this instance had adequate evidence before him for which he could increase the presumptive sentence and he disclosed the factors which led him to the increase. In light of the nature of the crime, its victims, and the character of the offender, four years imprisonment is not an unreasonable sentence. Therefore, the sentence will not be revised by this Court.

No reversible error having been demonstrated, the conviction and sentence of Janet Shanholt are affirmed.

Affirmed.

STATON and GARRARD, JJ., concur.