Douglas M. MITCHELL, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0311–CR–973.

Court of Appeals of Indiana.

Aug. 16, 2004.

Transfer Denied Nov. 10, 2004.

Tommy L. Strunk, Fishers, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Douglas Mitchell appeals his convictions for battery with injury to a child as a Class D felony[1] and disorderly conduct as a Class B misdemeanor.[2] We affirm both convictions, finding that Mitchell's conduct exceeded his legal authority to discipline his child; that Mitchell did not have to be asked to stop making unreasonable noise by a law enforcement officer in order to be convicted of disorderly conduct; that his constitutional right to free expression was not implicated because there was no state action; and that it was harmless error for the trial court to determine that Dr. An, Mitchell's wife, could not qualify as an expert witness.

### Facts and Procedural History

One afternoon in June 2002, two Methodist Hospital ("Methodist") employees, Christy Rohrman and Christopher Wilson, were exiting the hospital cafeteria when they heard Mitchell yelling at his child. Mitchell and his two children, a two-year-old and four-year-old M.M., were at Meth-

---

1. Ind.Code § 35–42–2–1(a)(2).

2. Ind.Code § 35–42–1–3(2).

odist visiting Dr. Caroline An, Mitchell's wife and the children's mother. According to Wilson, Mitchell was yelling at M.M. "to pick up the f***ing bottle," and Mitchell was holding M.M. by his shirt, with M.M.'s face about a foot above the bottle on the ground. Tr. p. 44. Mitchell then picked up M.M. by his shirt and threw the child over his right shoulder, all the while clutching the two-year-old in the crook of his left arm. Shortly thereafter, M.M. was either dropped or slid off Mitchell's shoulder to the floor, falling from approximately two to three feet in the air. According to Rohrman, Mitchell then swung his leg toward his son—"like you would kick a kickball" [3]—while continuing to yell that M.M. was a " 'f***ing spoiled brat.' He was just in such a chaotic rage he probably doesn't even remember what he was saying...." *Id.* at 38.

Rohrman, followed by Wilson, ran after Mitchell to confront him in the hospital parking lot about his behavior. Observing that the two-year-old was sliding out of his left arm into a sort of headlock position while Mitchell continued to yell at M.M. as he placed him in the backseat of his vehicle, Rohrman called out, "Sir, sir. Stop. You can't treat your children that way." *Id.* at 48. Having placed M.M. in the vehicle, Mitchell wheeled around to shout at Rohrman face-to-face:

> He was yelling and screaming right in my face and telling me that it was not any of my business[,] that his wife was a doctor there, and that his child was a 'f***ing spoiled brat,' and he had to stay home with him everyday, and I didn't know what he had to go through with him and to mind my own business.

*Id.* at 38–9. Mitchell was standing so close to Rohrman that another employee inter-

vened and asked Mitchell to step back. Rohrman requested that someone call security. When Rohrman approached the vehicle to write down Mitchell's license plate number, she observed M.M. acting "dazed" and crying. *Id.* at 40.

Meanwhile, Methodist security officers Cherle Harris and Dewayne Posley received a dispatch requesting them to report to the hospital lobby. Harris and Posley followed the assembled crowd out the front door and observed the altercation between Rohrman and Mitchell. The security officers approached Mitchell, asking if they could speak with him. According to Harris, "He refused to answer any of our questions.... He was very red.... He was loud. He was cursing.... He told me those were his f'ing kids. They were some spoiled ass brats. He has to do them like this because they are so damned spoiled...." *Id.* at 109–10. Concerned for the safety of the two-year-old, whom Mitchell was still clutching, Harris asked Mitchell repeatedly to hand over the baby, but Mitchell refused.

George Scott, a Clarian Safety and Security investigator and supervisor, was summoned to meet with the security officers detaining Mitchell. Mitchell told Scott that he was waiting on his wife, and he behaved in a very agitated manner. Scott testified that during this incident, he had to ask Mitchell repeatedly—"at least three times"—to calm down. *Id.* at 102. At some point, Mitchell went and retrieved M.M. from the vehicle. Posley testified that at this point he observed redness on M.M.'s neck. Dr. An, Mitchell's wife and the children's mother, appeared soon thereafter, took the two-year-old from Mitchell, and then handed over both of the

---

**3.** The evidence is inconclusive as to whether Mitchell's foot actually made contact with M.M. or whether, as Mitchell insists, he kicked his leg toward M.M. but "missed him." Tr. p. 155.

children. Security Officer Posley placed handcuffs on Mitchell because, according to Scott, "we thought he was getting a little agitated there and for officer safety." *Id.* at 105.

By this time, Indianapolis Police Department Officer Phillip Malicoat had responded to a dispatch run to assist Methodist security officers. Upon arrival, Officer Malicoat observed a large group of people—five to nine Methodist staff members and security officers—and Mitchell, handcuffed, standing outside the hospital. Officer Malicoat spoke with a couple of witnesses and then asked Mitchell to explain what had happened. Mitchell told Officer Malicoat that he had taken some "over the counter supplements for his bodybuilding, and he lost his cool in disciplining his child." *Id.* at 143. Officer Malicoat continued his investigation, speaking with witnesses and then Mitchell's children, who were inside a Methodist office with their mother; he observed that M.M. had at least a couple of fresh scratches "that just barely broke the skin with very minimal bleeding" on the back of his neck. *Id.* at 146. Ultimately, Officer Malicoat placed Mitchell under arrest.

The State charged Mitchell with battery as a Class D felony and disorderly conduct as a Class B misdemeanor. At the bench trial, Mitchell introduced into evidence a deposition of Chrissa L. Collings, M.D., who had examined M.M. two days after the incident. In her deposition, Dr. Collings stated, "[M.M.] had a bruise on his left elbow and right upper arm and knees . . . ." but later in the deposition said she believed the bruises on the left elbow were "older bruises." Defense Exhibit B p. 12, 14. When asked if she found anything in the course of her examination to indicate that there had been abrasions or breaking of the skin, Dr. Collings had replied, "I wrote, 'No sign of bleeding,' in the chart. So I don't believe so." *Id.* at 13. Mitchell also elicited testimony at the trial from Dr. An, his wife, concerning her examination of M.M immediately after the incident, but the trial court refused to qualify Dr. An as an expert witness because of her relationship with Mitchell. Following the bench trial, the trial court found Mitchell guilty on both charges. Mitchell now appeals his convictions.

## Discussion and Decision

Mitchell raises several issues on appeal. First, he argues that there is insufficient evidence to support the battery conviction because his "disciplinary" actions did not exceed the scope of his legal authority as a parent. Second, he argues that his disorderly conduct conviction cannot stand for two reasons: (1) there is insufficient evidence to support the disorderly conduct conviction because he was not asked to stop making unreasonable noise by a law enforcement officer, and (2) he was exercising his constitutional right to engage in expressive activity as guaranteed by article I, § 9 of the Indiana Constitution. Finally, Mitchell argues that the trial court erred in determining that Dr. An, Mitchell's wife and M.M.'s mother, could not be an expert witness.[4] We consider each issue in turn.

### I. Battery and Indiana Code § 35–41–3–1

■ Mitchell argues that the evidence is insufficient to support his battery conviction because his actions were within the scope of his legal authority to discipline his child pursuant to Indiana Code § 35–41–3–

4. Mitchell presents no cognizable argument as to how the trial court erred in "excluding the testimony of Chrissa Collings, M.D." Appellant's Br. p. 10. Therefore, Mitchell has waived review of this issue. *See* Ind. Appellate Rule 46(A)(8)(a). In any event, the record reflects that the majority of Dr. Collings' deposition was admitted into evidence.

1. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine the credibility of witnesses. *Allen v. State*, 787 N.E.2d 473, 482 (Ind.Ct. App.2003), *trans. denied*. Rather, we look solely to the evidence most favorable to the judgment together with all reasonable inferences to be drawn therefrom. *Id.* A conviction will be affirmed if the probative evidence and reasonable inferences to be drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

▮▮▮ To convict Mitchell of battery with injury to a child, the State must prove beyond a reasonable doubt that he knowingly or intentionally touched a person less than fourteen years of age in a rude, insolent, or angry manner and that touching resulted in bodily injury. Ind.Code § 35–42–2–1(a)(2)(B). But Mitchell asserts the defense of parental discipline pursuant to Indiana Code § 35–41–3–1, which provides: "A person is justified in engaging in conduct otherwise prohibited if he has legal authority to do so." This Court has found that the defense of legal authority includes reasonable parental discipline that would otherwise constitute battery. *Smith v. State*, 489 N.E.2d 140, 141 (Ind.Ct.App. 1986), *reh'g denied, trans. denied*; *see also Johnson v. State*, 804 N.E.2d 255 (Ind.Ct.App.2004).

> The law is well settled that a parent has the right to administer proper and reasonable chastisement to his child without being guilty of an assault and battery; but he has no right to administer unreasonable or cruel and inhuman punishment. If the punishment is excessive, unreasonable, or cruel[,] it is unlawful. The mere fact that the punishment was administered by the appellant upon the person of his own child will not screen him from criminal liability.

*Smith*, 489 N.E.2d at 142 (quoting *Hornbeck v. State*, 16 Ind.App. 484, 45 N.E. 620 (1896)). There is precious little Indiana caselaw providing guidance as to what constitutes proper and reasonable parental discipline of children, and there are no bright-line rules. Nonetheless, the evidence supports the trial court's finding that Mitchell's treatment of his four-year-old son was excessive and did not fall within the scope of reasonable parental discipline.

Witness Rohrman testified that when she and Wilson observed Mitchell's parenting skills in action—holding M.M. over the bottle on the floor, hoisting M.M. up by his shirt and then allowing M.M. to drop to the hospital floor before kicking his leg at him, all the while referring to M.M. loudly and repeatedly as a "f***ing spoiled brat"—Mitchell was in "a chaotic rage." Tr. p. 38. Hence, Mitchell knowingly or intentionally touched M.M. in a rude or angry manner. Moreover, four-year-old M.M. sustained bodily injury as a result of the incident: Security Officer Posley testified as to the redness of M.M.'s neck; Officer Malicoat testified that he had observed at least a couple of fresh scratches on his neck; and during an examination of M.M. a couple of days after the incident, Dr. Collings observed bruises on his right upper arm and knees. *See Hanic v. State*, 406 N.E.2d 335, 337–38 (Ind.Ct.App.1980) (finding that testimonial evidence of red marks, bruises, and minor scratches is sufficient to support a conviction for battery causing bodily injury). Considering the young age of the child, the injuries sustained, and the disproportion between the punishment inflicted upon M.M. and the child's alleged misbehavior, we find the evidence is sufficient to support Mitchell's conviction for battery with injury to a child as a Class D felony.

Mitchell's arguments on appeal, which consist primarily of minimizing the harm to M.M. and insisting that Mitchell's behavior was not excessive but was justified and distinguishable from prior caselaw involving parental discipline, are merely an invitation to reweigh the evidence, which we decline to do. The trial court was entitled to conclude that Mitchell's behavior was excessive, unreasonable, and outside the bounds of appropriate parental discipline, and the mere fact that it was imposed by an out-of-control parent upon his four-year-old child does not shield Mitchell from criminal liability.

## II. Disorderly Conduct

■ Mitchell also contends that his disorderly conduct conviction cannot stand for two reasons: (1) the evidence is insufficient to support a disorderly conduct conviction because he was not asked to stop making unreasonable noise by a law enforcement officer, and (2) he was exercising his constitutional right to engage in expressive activity pursuant to article I, § 9 of the Indiana Constitution. In order to convict Mitchell of disorderly conduct as a Class B misdemeanor, the State must prove beyond a reasonable doubt that Mitchell "recklessly, knowingly, or intentionally ma[de] unreasonable noise and continue[d] to do so after being asked to stop." Ind.Code § 35–45–1–3(2). To sustain a conviction, the State must show that the complained-of speech infringed upon the right to peace and tranquility enjoyed by others. *Hooks v. State*, 660 N.E.2d 1076, 1077 (Ind.Ct.App.1996), *trans. denied.*

■ The evidence shows that Mitchell first attracted attention while shouting in the Methodist lobby that four-year-old M.M. was a "f***ing spoiled brat," Tr. p. 38, and that he responded in a loud and extremely hostile manner toward witnesses and security officers who attempted to confront him outside the hospital. Mitchell "was yelling and screaming" at Rohrman that "his wife was a doctor ... and his child was a 'f***ing spoiled brat' ... and to mind [her] own business." *Id.* at 38–9. According to Security Officer Harris, "[h]e was very red.... He was loud. He was cursing...." *Id.* at 109–10. At least one person, Scott, asked Mitchell repeatedly to calm down. Indeed, Mitchell admitted during cross-examination that the hospital security officers asked him to "quiet down" and he did not do so. *Id.* at 161. Particularly in light of the hospital setting, it is clear that Mitchell's speech infringed on the right to peace and tranquility enjoyed by others. *See Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996) ("The State must prove that a defendant produced decibels of sound that were too loud for the circumstances."); *Hooks*, 660 N.E.2d at 1077 ("To sustain a conviction, the State must show that the complained-of speech infringed upon the right to peace and tranquility enjoyed by others."); *Radford v. State*, 640 N.E.2d 90, 93 (Ind.Ct.App.1994) ("Radford's abusive and harmful speech invaded the privacy of those patients in the hospital and destroyed their right to a quiet and peaceful environment. Patients with heart conditions and patients with nervous disorders, among others, come to the hospital expecting quietude."), *trans. denied.* Thus, the evidence shows that Mitchell was "mak[ing] unreasonable noise and continue[d] to do so after being asked to stop[.]" I.C. § 35–45–1–3(2).

■ Mitchell asserts, however, that his disorderly conduct conviction cannot stand because he was not asked to stop making unreasonable noise by someone "with authority to do so," i.e., a law enforcement officer. Appellant's Br. p. 9. He does not challenge the constitutionality of the disorderly conduct statute on the grounds of

vagueness, but rather his attack upon the conviction is premised upon a reading of the statute that would require a warning to be given by a law enforcement officer. Because this Court has never had the opportunity to consider the question presented by Mitchell's argument, we do so today.

As a general proposition, one might surmise that a warning or admonition against continued criminal conduct would have to be given by a law enforcement officer. *See* 12 Am.Jur.2d, *Breach of Peace* § 32 (1997); 11 C.J.S. *Breach of Peace* § 5b (1995). In some jurisdictions, the legislature has specifically enunciated in their statutes the requirement of a warning by a law enforcement officer. In Hawaii's statute, for instance, the warning must be given by a "police officer." Haw.Rev.Stat. § 711–1101. In Texas, it is a defense if the conduct or noise is speech or other communication unless the actor is "first ordered to remedy the violation by the proper authorities." *Bowie v. State*, 841 S.W.2d 963, 964 (Tex.App.1992). But the Texas statute states that the order may be given by a "peace officer, a fireman, a person with authority to control the use of the premises, or any person directly affected by the violation." *Id.* at n. 2; Tex. Penal Code Ann. § 42.01.

Other state statutes, though silent as to who must give the warnings, have been construed by courts to include a law enforcement warning requirement. In Maryland, the statute under consideration in *Eanes v. State* prohibited "loud and unseemly noises" but did not contain a warning requirement. *Eanes,* 318 Md. 436, 569 A.2d 604 (1990); Md.Code Art. 27, § 121 (now repealed). The Maryland Court of Appeals, however, to assure "fair notice" to the actor as to what was forbidden, read into the statute a requirement for prior warning by "police authority." *Id.* at 617. Similarly, Pennsylvania's statute does not include a law enforcement warning requirement. 18 Pa. Cons.Stat. § 5503. Nonetheless, in *Pennsylvania v. Mastrangelo,* the Pennsylvania Supreme Court emphasized a meter maid's official position in affirming the conviction of the defendant who hurled obscene epithets at her for ticketing his car and continued after being asked to stop by her. *Mastrangelo,* 489 Pa. 254, 414 A.2d 54, 56 (1980).

As to Indiana's disorderly conduct statute, it does not, on its face, impose a requirement that the person making unreasonable noise must be "asked to stop" by a law enforcement officer. I.C. § 35–45–1–3(2). Generally, we give a facially clear and unambiguous statute its plain and clear meaning. *See Goffinet v. State,* 775 N.E.2d 1227, 1235 (Ind.Ct.App. 2002). Moreover, we do not ordinarily read requirements into statutes. This is so especially where the legislature has demonstrated in other statutes that it is capable of including the omitted language. *See, e.g.,* Ind.Code § 34–28–5–3.3 (Refusal to identify self "to a law enforcement officer. . . ."); Ind.Code § 35–42–2–1(a)(2) (Battery is a Class D felony "if it results in bodily injury to a law enforcement officer. . . ."); Ind.Code § 35–44–3–3 ("A person who . . . forcibly resists, obstructs, or interferes with . . . or flees from a law enforcement officer . . . commits resisting law enforcement. . . .").

Nevertheless, we do have at least some direction from our supreme court as to who is required to give the warning before a person can be found guilty of disorderly conduct. Indeed, our supreme court case of *Whittington v. State,* 669 N.E.2d 1363 (Ind.1996), is cited in the Am.Jur.2d discussion as authority for the premise that a warning by a police officer is required. The case itself, however, is not so explicit. Although in that case a law enforcement officer was the individual giving the admo-

nition to the defendant, the *Whittington* court couched the requirement in terms of an "official warning." *See Whittington,* 669 N.E.2d at 1370 ("[A] conviction for disorderly conduct requires proof of 'unreasonable noise' both before and after *an official warning.*") (emphasis supplied). We therefore determine that the statute requires an official warning.

Turning to the facts of this case, the person who asked Mitchell repeatedly to calm down was not a law enforcement officer but was, instead, the superior officer of security on duty at Methodist at the time the incident occurred. To be sure, this would appear to be the very point of the hospital security officers: to protect the hospital patients and staff from danger or disruption and to expel or to subdue dangerous or disruptive elements from the hospital in order to maintain a safe and orderly environment. Thus, we find that the disorderly conduct statute does apply in these circumstances—that the warnings given by hospital security personnel were sufficiently "official" to satisfy the dictate of "an official warning" as set forth in *Whittington, supra*—even though the person asking Mitchell to stop making unreasonable noise was not a law enforcement officer.[5] The evidence is sufficient to support Mitchell's conviction for disorderly conduct.

■ But Mitchell also asserts that the conviction violates his constitutional right to freedom of expression as guaranteed by article I, § 9 of the Indiana Constitution. We disagree. When reviewing the constitutionality of the disorderly conduct statute, we perform a two-step inquiry. *Whittington,* 669 N.E.2d at 1367. First, a reviewing court determines whether state action has restricted the claimant's expressive activity. *Id.* Second, if it has, the reviewing court must decide whether the restricted activity constituted an "abuse" of the right to speak. *Id.*

■ Here, article I, § 9 of the Indiana Constitution has not been implicated because there was no state action. *See id.* at 1368 ("The right to speak clause focuses on the restrictive impact of state action on an individual's expressive activity."). Mitchell concedes that the security officers were acting as private citizens. Appellant's Br. p. 6. Hence, Mitchell has not made it past the first step: to the extent that his expressive activity was restricted, the restriction was imposed by private, rather than state, actors.[6] We

---

5. As to the applicability of the disorderly conduct statute where a person is asked to stop making unreasonable noise by someone who is not a law enforcement or a security officer, we leave that question for another day.

6. Even if we were to find that Officer Malicoat—a state actor—restricted Mitchell's right to speak and express himself, Mitchell still would not prevail on his constitutional claim. "[I]f a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not reasonably conclude that the restricted expression was an 'abuse.'" *Whittington,* 669 N.E.2d at 1369 ("[E]xpressive activity constitutes 'abuse' if, notwithstanding § 9, it is punishable within the strictures of the police power."). Mitchell presents the following ar-

gument in his brief: "Mitchell was in the process of disciplining his children, and in an admitted loud voice. Mitchell['s] use of profanity [was] in protest to interference by other persons, and at no time did Mitchell challenge any one to fight nor did he threaten the safety of any person." Appellant's Br. p. 8. Mitchell then discusses *Price v. State,* in which our supreme court held that "treating as abuse political speech which does not harm any particular individual ("public nuisance") does amount to a material burden, but that sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not." *Price,* 622 N.E.2d 954, 964 (Ind.1993). Thus, although it is not clear, it appears that Mitchell is asserting that his speech was pure political expression. Mitchell's speech was

conclude that there is no merit to Mitchell's constitutional claim, and we affirm his conviction for disorderly conduct.

## III. Dr. An as Expert Witness

 Finally, Mitchell argues that the trial court erred in determining without hearing evidence that Dr. An could not be a medical expert witness for the purpose of testifying on "bruises" because she was not an unbiased third-party. Tr. p. 166. Indiana Evidence Rule 702 provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Ind. Evidence Rule 702. Pursuant to this rule, a witness may be qualified as an expert by virtue of "knowledge, skill, experience, training, or education." *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind.2003). Only one of these characteristics is necessary to qualify an individual as an expert. *Id.* Moreover, Rule 702(a) does not require that the witness be unbiased. 13 Robert Lowell Miller, *Indiana Practice* § 702.105 (1995). But it is within the trial courts

sound discretion to decide whether a person qualifies as an expert witness, and we will reverse only upon a showing that the trial court abused its discretion. *Creasy v. Rusk*, 730 N.E.2d 659, 669 (Ind.2000).

Here, the trial court sustained the State's objection to admitting Dr. An as an expert witness for the purposes of testifying about bruises on the grounds that she was not an unbiased third-party. In response to Mitchell's request for a hearing on the issue of Dr. An's qualification as an expert witness, the trial court stated, "I don't think that no matter what you do she can qualify as an expert in this case." Tr. p. 174. The trial court stated further, "I am listening to her as if she is a doctor, and a mom, and not an expert." *Id.* at 173. Dr. An then went on to testify about her observations—including whether she had observed bruises, as opposed to Mongolian spots [7]—when she examined M.M. immediately after the incident.

We find that it was an abuse of discretion for the trial court to determine without hearing evidence that Dr. An—though apparently otherwise qualified—could not here testify as an expert witness because she could not be impartial and unbiased. While we recognize that "evidence of personal relationships has been accepted as being indicative of bias," *see Shanholt v. State*, 448 N.E.2d 308, 316 (Ind.Ct.App. 1983), Mitchell was entitled to the benefit of Dr. An's testimony if she was otherwise

not pure political expression, however, since his statements were directed at and concerned with the conduct of private actors. *Whittington*, 669 N.E.2d at 1370 ("Expressive activity is political, for the purposes of the responsibility clause, if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under color of law.") In any event, Mitchell has failed to meet his burden of proving the second prong of the test, i.e., that the State

could not reasonably conclude that the restricted expression was an "abuse." *See id.* at 1369.

7. According to Dr. An's testimony, Mongolian spots are "pigmented skin cells that occur in the sacral region most commonly in Asian–American and African–American ... children." Tr. p. 170. The evidence showed that Dr. An, M.M.'s biological mother, is of Asian descent.

qualified to be an expert witness. The proper procedure under these circumstances would have been to permit the State to expose any actual bias through cross-examination. *See id.* ("[I]t has been held that a party has a right to cross-examine an opposing party's witness on matters which tend to impair that witness's credibility or to show her interest, bias, or motives."). Moreover, the revelation of any actual bias should have gone to the weight of Dr. An's testimony rather than to her ability to testify—assuming she was otherwise qualified—as an expert witness.

When reviewing an erroneous evidentiary ruling by the trial court, we apply the harmless error rule, determining if the probable impact of the error, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Black v. State,* 794 N.E.2d 561, 565 (Ind.Ct.App.2003). Here, we find that the trial court's error in determining that Dr. An could not be an expert witness did not affect Mitchell's substantial rights because Dr. An was permitted to testify about bruises and, in any event, the evidence was cumulative of information contained in the deposition of Dr. Collings, who performed an examination of M.M. two days after the incident. Therefore, we find that the trial court's refusal to permit Dr. An to testify as an expert witness was harmless error.

Affirmed.

SULLIVAN, J., and MAY, J., concur.