**George BLACK, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 41A04–0204–CR–180.

Court of Appeals of Indiana.

Aug. 29, 2003.

Michael K. Sutherlin, Joseph H. Merrick, Michael Sutherlin & Associates, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Christopher C.T. Stephen, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

MATHIAS, Judge.

The Johnson County Superior Court found that George Black ("Black") violated the conditions of his probation and stayed the execution of his sentence pending this appeal. The parties present the following restated issues for review:

I.    Whether the trial court erroneously excluded a court-ordered urinalysis from evidence; and,

II.   Whether the trial court's exclusion amounted to harmless error.

Concluding that the trial court relied on vacated and superseded case law in excluding the urinalysis and that the State failed

to meet its burden of establishing harmless error, we reverse.

## Facts and Procedural History

On September 22, 1999, Black was ordered to serve 547 days probation pursuant to his Class D felony conviction of operating a motor vehicle while intoxicated. A condition of Black's probation required him to abstain from the use of illegal drugs.

On July 10, 2001, Black met with his probation officer, Jason Phillips ("Phillips"), who asked Black to provide a urine sample to be tested for illegal narcotics. Upon receiving the sample, Phillips conducted a "Rapid Drug Screen" field test ("RDS"), which revealed the presence of cocaine metabolites.

In a RDS, the probationer's urine is collected in a sample container that has a temperature strip that acts as a gauge to determine whether the urine sample is within a proper temperature range.[1] A test strip is then inserted through the container lid, and the end of the strip is submerged in the sample, whereupon it indicates whether the sample contains cocaine metabolites. The RDS test kits must be maintained at room temperature, and the results of the RDS should not be interpreted after the sample is more than ten minutes old.

According to his testimony, Phillips was unaware of any storage requirements and failed to check the temperature gauge while conducting Black's test. Tr. pp. 20–21. Furthermore, Phillips could not recall whether the time period in which the results were interpreted was less than ten

minutes or whether he had any difficulty submersing the test strip in the sample. Tr. pp. 20–21, 25, 27. Black testified that the test procedure took over ten minutes, that Phillips had difficulty getting the test strip into the sample, and that Phillips set the test strip on the bathroom window ledge. Tr. pp. 202, 204.

After Black's sample tested positive, it was sealed and put into a refrigerator in the Johnson County Probation Department ("JCPD"). On the following day, it was delivered to the Witham Toxicology Laboratory ("Witham"), the State's testing laboratory, for the purpose of conducting confirmatory tests. Witham performed two tests on this sample. The first test indicated the presence of cocaine metabolites, and the second indicated the cocaine metabolite level to be 430 milligrams per milliliter.

The day the RDS revealed the presence of cocaine metabolites, Black went to AIT Laboratories ("AIT") for the purpose of having a second chemical analysis performed on a sample he provided at that time. AIT conducted a test that would reveal the presence of cocaine metabolites in Black's urine—if the metabolites were of a concentration greater than 300 milligrams per milliliter. This test proved negative, indicating that, at worst, Black's cocaine metabolite concentration was 300 milligrams per milliliter or less.[2]

After learning that his sample had tested positive in Witham's confirmatory tests, Black requested the trial court to order the Witham sample retested in a different laboratory. Consequently, this sample

---

1. Black asserts that the purpose of the temperature strip is to insure an accurate reading. Br. of Appellant at 8. However, we find nothing in the record that indicates that the purpose of the temperature strip is to insure an accurate reading.

2. Dr. Michael Evans, CEO and laboratory director of AIT, indicated that cocaine metabolites are normally detectable for a period of two to five days following the ingestion of cocaine and the half-life of cocaine's presence in urine is two to three hours. Tr. p. 94.

was sent to Med–Tox Laboratories in Minneapolis, Minnesota—an independent laboratory that provides toxicology services for the State. In stark contrast to the Witham test results, the Med–Tox test indicated that Black's sample contained 528 milligrams of cocaine metabolites per milliliter—98 milligrams higher than Witham's initial test conducted on the same sample.[3]

Based upon this evidence, the State moved to revoke Black's probation. Prior to the revocation hearing, Black filed a motion for the State to produce evidence it planned to use at his hearing. The State responded by stating that it did not possess the items requested and informed Black that this information could be obtained by contacting the JCPD. The revocation hearing took place on March 7, 2002. During the hearing, Black moved to strike all evidence due to the State's failure to provide the information requested in his Motion to Produce. The trial court denied this request, finding that no orders on discovery had been requested or violated.

Black then elicited testimony from Jeff Retz ("Retz"), the State's toxicology technician, regarding the court-ordered Med–Tox test. The trial court, pursuant to State's objection, found Retz's testimony insufficient to provide a foundation for the Med–Tox test and excluded the test results from evidence. Tr. pp. 62–65.

The trial court found that Black had violated the terms of his probation by testing positive for cocaine but stayed Black's sentence pending this appeal.

## I. Admission of the Med–Tox Test

Indiana Rule of Evidence 101(c)(2) states that, "[t]he rules, other than those with respect to privileges, do not apply in ... [p]roceedings relating to ... probation." Ind. Evidence Rule 101(c)(2). A probation revocation hearing is not to be equated with an adversarial criminal proceeding. *Cox v. State*, 706 N.E.2d 547, 550 (Ind.1999) (citing *Isaac v. State*, 605 N.E.2d 144, 149 (Ind.1992)). Rather, a revocation hearing is a narrow inquiry, and its procedures are more flexible than those of a criminal proceeding. *Id.*

In revocation hearings, judges may consider any relevant evidence bearing some substantial indicia of reliability, including expert testimony and scientific evidence. *Carter v. State*, 706 N.E.2d 552, 554 (Ind.1999) (noting that it is beyond doubt that urinalysis has achieved a sufficient level of scientific reliability to be accepted into evidence); *see also Cox*, 706 N.E.2d at 550 (holding hearsay admissible in revocation hearings); *cf. Pitman v. State*, 749 N.E.2d 557, 559 (Ind.Ct.App. 2001), *trans. denied* (holding that certified charging informations and police reports are deemed admissible in revocation hearings). *Contra Baxter v. State*, 774 N.E.2d 1037, 1043 (Ind.Ct.App.2002), *trans. denied* (holding uncertified investigation reports of law enforcement personnel inherently unreliable and inadmissible in revocation hearings). However, judges are not required to admit all evidence presented in such hearings. *Cox*, 706 N.E.2d at 551.

---

**3.** Black states that the increase in metabolites found in the subsequent test is scientifically impossible because "the natural properties of urine have a half-life that decompose over time." Br. of Appellant at 15. Although not addressed by the State, we note that this is a mischaracterization of the evidence. The record clearly indicates that the reference to the half-life of cocaine metabolites concerns the breakdown of cocaine metabolites *while in the body*. Tr. p. 94. Nonetheless, we acknowledge the expert testimony indicating that it is scientifically impossible for the metabolites to increase over time while contained in a urine sample. Tr. p. 98.

This absence of strict evidentiary rules places particular importance on the fact-finding role of judges in assessing the weight, sufficiency, and reliability of proffered evidence. *Id.* This assessment, then, carries with it a special level of judicial responsibility and is subject to appellate review. *Id.*

When Black attempted to admit the Med–Tox results the deputy prosecutor objected stating, "[y]our Honor, I object to hearsay. [No] testimony here [regarding] the chain of custody of Med–Tox, there [was] no testimony [regarding] the test that [was] done from Med–Tox." Tr. p. 63. The trial court responded to this objection by noting, "I think under 101(c), we don't have the rules of evidence ... overruled." Tr. p. 63. However, shortly thereafter, the deputy prosecutor renewed his objection, stating:

Once again, [I] object, there is no foundation for the result at Med–Tox. There may not be uh, the rules of evidence do not apply, but you still need a foundation to admit the results of the test. Even in a probation fact-finding hearing. I would not[e] .... for support of this argument, I will show the court *Carter v. State*, 685 N.E.2d 1112. An Indiana Appellate Court case in 1997 that requires a foundation for [urinalysis and] revocation hearings.

Tr. p. 64. On the basis of this case, the trial court reversed itself and excluded the Med–Tox test results. Tr. p. 65.

*Carter v. State*, 685 N.E.2d 1112 (Ind.Ct. App.1997), cited by the deputy prosecutor, was vacated and superceded roughly two years later by *Carter*, 706 N.E.2d 552. Under the relaxed procedures of a revocation hearing, announced by our supreme court in *Carter*, 706 N.E.2d at 552–54, Retz's testimony, which indicated that Med–Tox laboratories are trustworthy, reliable, and nationally certified, was a sufficient foundation for the admission of the results of the Med–Tox test. Tr. pp. 62, 97. Consequently, the trial court's initial statement of the law was correct, and it should not have reversed itself on the basis of *Carter*, 685 N.E.2d 1112.

## II. Harmless Error

■ The State asserts, "[Black's probation revocation] will not be reversed if the State can demonstrate 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " Br. of Appellee at 6 (citing *Standifer v. State*, 718 N.E.2d 1107, 1110 (Ind.1999)) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Black, prudently, accepted the State's "proffered" harmless error standard. Reply Br. of Appellant at 5.

■ There are two types of harmless error tests. When reviewing errors in the application of state evidentiary or procedural law, as distinguished from errors that affect federal constitutional rights, Indiana appellate courts apply their own harmless error rule—determining if the probable impact of the error, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind.1995). Under federal harmless error analysis, which is triggered by an error affecting the Defendant's federal constitutional rights, the State has the burden of proving beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Spivey v. State*, 761 N.E.2d 831, 836 (Ind.2002).

The harmless error test proffered by the State, and, we believe, the correct test, is the federal harmless error standard. However, *Standifer*, cited by the State in support of this position, is a criminal case, and it is not altogether clear whether the

federal harmless error test applies to probation revocation cases.

■■■■ Though distinguished from criminal tribunals by their informality and flexibility, probation revocation hearings are nonetheless regulated by the due process clause of the Fourteenth Amendment—including the right to confront and cross-examine witnesses. *Medicus v. State*, 664 N.E.2d 1163, 1164 (Ind.1996); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[4] An error inhibiting a defendant's federal constitutional rights triggers the federal harmless error test.[5]

Thus, it is reasonable to assert that the federal harmless error test applies to probation revocation proceedings.[6] However, because this issue was not argued on appeal, we only apply the federal harmless error standard as a result of State's waiver and leave this issue open for argument in subsequent cases.

Black's defense to the revocation proceedings was that the test procedures of the JCPD were inaccurate and it was this inaccuracy, rather than his alleged use of cocaine, that produced the positive test result. Evidence indicating that the State's laboratory had misidentified samples in the past in combination with the excluded evidence indicating that the second test produced a result scientifically irreconcilable with the first test buttresses Black's claim that his positive test result was a consequence of mishandling or misidentification.[7] Tr. p. 58–59. Consequently, the error precluding the trial court's consideration of the second Med–Tox test necessarily contributed to its decision to revoke Black's probation and, as such, cannot be said to have been harmless.[8]

---

**4.** Some may assert that it is illogical to apply the federal "beyond-a-reasonable-doubt" standard to probation revocation proceedings, which apply a "preponderance" quantum of proof. However, the federal beyond-a-reasonable-doubt standard is not a quantum of proof applied to the sufficiency of the evidence supporting the defendant's guilt, but is a standard to determine the effect of an error on the verdict. When conducting federal harmless error analysis, we do not determine whether there was sufficient evidence to prove revocation beyond a reasonable doubt; rather, we determine whether it can be stated, beyond a reasonable doubt, that the error complained of did not contribute to the verdict obtained. *See Ground v. State*, 702 N.E.2d 728, 733 n. 4 (Ind.Ct.App.1998); *Saperito v. State*, 490 N.E.2d 274, 278 (Ind.1986) (noting, "of course, the test for harmless error is not whether the evidence was sufficient without the offending testimony, but whether the testimony might have had a substantial effect on the verdict"); *Griffin v. State*, 664 N.E.2d 373, 377 (Ind.Ct.App.1996) (*while there may exist substantial evidence of [the defendant's] guilt*, we determine that the excluded evidence's probable impact on the jury, in light of the evidence in the case,

affected [the defendant's] substantial rights) (emphasis added). Thus, the application of the federal harmless error standard to probation revocation proceedings would not impermissibly convert the quantum of proof in such proceedings from a preponderance quantum to a beyond-a-reasonable-doubt quantum.

**5.** The error complained of by Black inhibited his right to the confrontation of the Med–Tox test results.

**6.** We also note that *Grubb v. State*, 734 N.E.2d 589, 593 (Ind.Ct.App.2000), a probation revocation case, seems to have applied the federal harmless error standard. *Id.* (citing *Smith v. State*, 721 N.E.2d 213, 218–19 (Ind.1999), a criminal case that applied the federal harmless error standard).

**7.** The laboratory used by the State lost a contract with a school corporation because of misidentified samples that led to the false accusation of individuals. Tr. p. 58.

**8.** The State asserts that the excluded evidence was harmless because, "[a]lthough the test results indicated a different concentration, it

This is not to say that the probation revocation court could not have found Black to have violated his probation if the Med–Tox results were admitted. It is possible that the State, which bore the burden of proof, could have produced a benign explanation of the scientifically irreconcilable test results; however, the State forfeited this opportunity when it precluded the trial court's consideration of this evidence by convincing the trial court not to admit the Med–Tox test results on the basis of vacated and superceded law.

### Conclusion

The trial court improperly excluded the Med–Tox test results, and this exclusion was not harmless error.

Reversed.

KIRSCH, J., and MAY, J., concur.

nevertheless revealed the presence of cocaine in the sample." Br. of Appellee at 6. This assertion begs the question of how the cocaine metabolites got into the sample and does not address Black's contention that the scientifically impossible test results indicate that the presence of cocaine metabolites were the result of mishandling or a misidentified sample.